[Civ. No. 2254. First Appellate District.—December 31, 1917.]

JESSIE MORENO, as Administratrix, etc., Respondent, v. NEW GUADALUPE MINING COMPANY (a Corporation), et al., Appellants.

NEGLIGENCE—DEATH OF MINING COMPANY EMPLOYEE—CAUSE OF ACCIDENT—EVIDENCE—DECLARATION OF DECEASED.—In an action against a mining company and one of its employees for the death of another employee alleged to have been caused by the negligence of the defendants, the declaration of the deceased made some thirty minutes after the accident in the presence of the defendant employee as to the cause and consequence of the accident was properly admitted, where the objection to the admission of the declaration rested solely upon the single ground that it was merely opinion evidence.

EVIDENCE — OBJECTION UPON SPECIFIC GROUNDS — PURPOSE.—The purpose of the rule which ordinarily requires that an objection to be available must be made upon specific grounds which point to the vice of the proffered proof is to call the trial court's attention to the defect in such proof, and thereby enable the court to rule upon the objection with such defect in mind.

ID.—STATEMENTS OF DECEASED—CAUSE OF ACCIDENT—NARRATIVE OF PAST EVENT.—In an action against a mining company and one of its employees for the death of an employee alleged to have been caused by the negligence of the defendants, statements of the deceased as to the cause and consequence of the accident made some thirty minutes thereafter are but the expression of an opinion, and no part of the *res gestae.*

ID.—DECLARATIONS IN PRESENCE OF PARTY—ADMISSIBILITY.—In view of subdivision 3 of section 1870 of the Code of Civil Procedure, providing that evidence may be given upon a trial of an act or declaration of another in the presence and within the observation of a party and his conduct in relation thereto, the declaration of a deceased person as to the cause and consequence of an accident made some thirty minutes thereafter, in the presence of and to one of the defendants, is admissible, at least as against such defendant.

ID. — PHYSICIAN AND PATIENT — WAIVER OF PRIVILEGE.—The privilege given by subdivision 4 of section 1881 of the Code of Civil Procedure, as such subdivision existed before the amendment of 1917, providing that a physician could not testify as to information acquired without the consent of the patient, is waived, in an action for death, by the administrator putting other witnesses on the stand to testify as to the nature of the injuries.

APPEAL from a judgment of the Superior Court of Santa Clara County, and from an order denying a new trial. P. F. Gosbey, Judge.

The facts are stated in the opinion of the court.

Crittenden & Simmons, C. L. Witten, and H. W. McComas, for Appellants New Guadalupe Mining Company.

William A. Nunlist, for Appellant Fred Porta.

George K. Ford, for Respondent.

LENNON, P. J.—In this action the plaintiff Jessie Moreno, as administratrix of the estate of her husband, Frederick Moreno, deceased, sought and secured a judgment against the defendants New Guadalupe Mining Company and Fred Porta, one of its employees, for the death of the deceased, alleged to have been caused by the negligence of said defendants. The case was tried with a jury and a verdict returned in favor of plaintiff and against both defendants in the sum of eight thousand dollars. From the judgment entered thereon and from the order denying a new trial the defendants have appealed.

Briefly stated, the facts of the case are these: The defendant New Guadalupe Mining Company was a corporation engaged in the working of a mine in the county of Santa Clara. On the third day of August, 1913, the decedent, Frederick

Moreno, was employed by the corporation defendant as a "tool nipper." In such capacity it was his duty to carry powder and the sharpened drills and tools used in the working of the mine down to the various levels of the mine and to bring such tools and drills as had been dulled by use to the surface. The shaft from the surface to the various levels of the mine ran at an angle of about forty-two degrees from the horizontal plane of surface, and installed in it were two parallel tracks on which cars or "skips" operated from the surface by cables attached to a drum, which was in turn operated by an engine. The cars or skips were used by employees of the corporation defendant to enter and leave the mine and also for the lowering of supplies into and the taking of ore from the mine. On August 3, 1913, the decedent Frederick Moreno was directed to take certain supplies down into the mine. At about 2 P. M. of that day the defendant Fred Porta, who was employed by the corporation defendant as a shift boss, but who was then operating the mechanism which controlled one of the cars, undertook to let the deceased down into the mine. When the car upon which the decedent was riding had descended about 450 feet into the mine it stopped suddenly, but what actually happened then to the decedent was known to, and witnessed by, no one save himself. The circumstances attending the descent of the decedent into the mine were narrated by one Celaya, who was the "hoistman" regularly employed at the mine to operate the engine which controlled the car, and who was called as a witness for the plaintiff.

He testified in part and to the effect that the car in which the decedent was descending, and which at the time was operated and controlled by the defendant Porta, was going down very fast—"at a very rapid rate of speed"—and that it was stopped "instantly by the jerk" at about forty or fifty feet from the station below, because the defendant Porta threw in the clutch which controlled the speed of the car. About thirty minutes after this sudden stop of the car in which the decedent was descending into the mine, this witness hoisted the decedent to the surface. The witness said that the decedent was pale and that upon coming to the surface the decedent in the presence of the defendant Porta narrated how and why the car stopped and what happened to him at the time. Shortly thereafter the decedent went to his home, but

returned the next day to his work and again descended into the mine, but remained there only a small portion of the day, when he went home.

The plaintiff Jessie Moreno testified that she was the wife of deceased; "that on the day of the accident decedent came home and said he felt pretty bad; that she gave him some salt water, and that he threw up a small quantity of blood, although not very much; that decedent did not return to work that day, but he did the following day; that he did not stay very long, he came back right away and went to bed and did not get out of bed any more; he stayed in bed until he died; that she saw him every day; upon the day of the accident decedent showed witness his left side, which was bruised; that thereafter it became black and remained black until the time of his death; she observed a bruise on his left side; thereafter it kept getting blacker every day; they gave her a little liniment to rub on it, which she rubbed on the bruise and side as directed; that from the first day after the accident decedent made frequent exclamations of pain; that he groaned lots and could not keep still in bed, the pain was so bad, and had difficulty in taking a long breath because the pain would hurt him lots."

Other members of the deceased's family and household testified that he had a black and blue bruise on the left side of his body and that he complained of pain in that side; that on the evening of the day of the accident the left side and back of the deceased showed a big red spot; that there were no scratches or cuts on the body and that the skin was not torn; that the following day the spot or bruise turned black and blue; that the discolored portion of the deceased's body was about a foot in diameter and extended around on the back about, but not quite, to the spinal column; that the deceased vomited very little and had little fever and no chills; that he was not delirious; that he did not get out of bed and was unable to get out of bed without assistance; that he continually complained of pain in the side and never complained of pain in the head.

Dr. Gober was first in attendance upon the deceased, and later Dr. Blair was called in. Both doctors made an examination of the body and the condition of the deceased. They continued in attendance upon the deceased until the time of

his death.   But neither doctor was called as a witness for the plaintiff.

The insufficiency of the evidence to show the cause of death of the deceased is the first point made in support of the appeal.   In response thereto we deem it sufficient to say that, although the evidence relied upon for the plaintiff to show the cause of death was wholly circumstantial, nevertheless we deem it sufficient to have warranted the court below in submitting the case to the jury, and we are not prepared to say that the jury could not have legitimately drawn from such evidence the inference that the accident in question was the cause of the death of deceased.

The point is made that the trial court erred to the prejudice of the defendants, and particularly the corporation defendant, in its ruling which permitted in evidence, over objection, the declaration of the deceased, made some thirty minutes after the accident in the presence of the plaintiff's witness, Celaya, and the defendant Porta, and which declaration the record shows was addressed to both the witness and the defendant Porta.

With reference to that phase of the case the record shows that Mr. Ford, one of the counsel for plaintiff, questioned the witness as follows:

"Q. What, if anything, did Mr. Moreno say to Mr. Porta in your presence?

"A. He said, 'You let me down pretty fast; he almost killed me'; he said, 'You stopped the skip on the jerk and threw on the clutch and dragged me quite a ways,' and he had his clothes all torn.

"Mr. Simmons, Counsel for the Defendants: That is objected to; merely opinion evidence.   I ask that that be stricken out, as to whether or not he almost killed him.

"The Court: There are some expressions of opinion.   It is not responsive to your question at all.   He asked him what he said and he answered 'he had his clothes all torn.'

"Mr. Ford: The answer generally was referring to the remark that Mr. Moreno said, 'You almost killed me.'

"The Court: That may stand, that is what the conversation was.   'He had his clothes all torn' may go out.

"Mr. Simmons: Even as to the remainder of that answer, as to the words 'You almost killed me,' I object to that also.

"The Court: Did he say that?

"Mr. Simmons: He said, 'You let me down pretty fast; you almost killed me.'

"The Court: It may stand."

It must be conceded, as counsel for the defendants contend, that the statements of the deceased which the trial court permitted in evidence were but the expression of an opinion as to the cause and consequence of the accident, and having been made some thirty minutes after the accident were clearly the narrative of a past event, and consequently were no part of the *res gestae.* But even assuming that it may be said that the trial court considered the objection to the evidence in question as having been seasonably made, still it must be noted that the objection as made was rested solely upon the single ground that the evidence elicited from the witness was "merely opinion evidence." The purpose of the rule which ordinarily requires that an objection to be available must be made upon specific grounds which point to the vice of proffered proof is to call the trial court's attention to the defect in such proof and thereby enable the court to rule upon the objection with such defect in mind. Ordinarily, therefore, the mere statement by a party that he "objects" to certain evidence is not entitled to consideration unless it can be clearly seen and said that such evidence is utterly incompetent and wholly inadmissible for any purpose within the issues of the case. In other words, when the evidence objected to is plainly prejudicial and palpably incompetent, and so evidently and absolutely inadmissible for any purpose within any conceivable legitimate view of the case, then a general objection should suffice to specify the evidence. Doubtless if the question objected to in the present case had called for and elicited the personal opinion of the witness on the stand, the objection as made, namely, "That it was merely opinion evidence," would have sufficed. But, plainly, that was neither the purpose nor the effect of the question, and it cannot be said that the evidence sought and elicited thereby was wholly incompetent and inadmissible for any purpose in the case, for it must be remembered that the question objected to called for a declaration of the deceased made in the presence of and to one of the defendants in the case. It is the rule that "evidence may be given upon a trial of . . . an act or declaration of another, in the presence and within the

observation of a party, and his conduct in relation thereto." (Code Civ. Proc., sec. 1870, subd. 3.)

Clearly, therefore, the evidence sought and elicited by the question objected to was admissible, at least as against the defendant Porta, for the purpose stated in the statutory rule, and consequently it must be held that the objection relied upon was rightly overruled whether considered as a mere general objection or limited, as perhaps in strictness it should be, to the ground upon which it was made.

That the plaintiff's case was presented upon the theory that the deceased died from "urosepsis," caused by an injury to the kidneys, is indicated by plaintiff's cross-examination of the medical witnesses who were called and testified for the defendant. The action was defended in part upon the theory that the deceased died directly as the independent result of typhoid fever and not as the result, directly or indirectly, of any injuries which he had received as the result of the accident.

In support of this defense Dr. Albert Charles Jayet, a physician and surgeon, was called as a witness and testified that he saw the body of Frederick Moreno, the deceased, about the 15th or 18th of August, 1913, at the Almaden Mines and assisted Dr. Gerlack in performing an autopsy on the body of the deceased; that such autopsy involved the opening and examining of all of the cavities of the body; that the kidneys were cut open and found to be in a normal condition; that had the kidneys been impaired in such a manner as to cause the death of the deceased it would have been discovered upon the autopsy; that the heart and lungs and all of the vital organs of the deceased were examined and found to be in a normal condition, save and except the brain, which, when removed and sliced, showed the presence of "a large pulpified mass of tissue," which was an abscess of the brain.

Dr. Gober was called as a witness for the defendants and his testimony as an expert witness was in part and without objection "that he had had experience with typhoid fever during practically every year of the last thirty years; that during the months of July and August, 1913, he had three cases of typhoid fever at the New Guadalupe Mine; that each of the cases was normal and ran in the normal and average course of typhoid fever; that one of these cases proved fatal; that in the usual case of typhoid fever the patient complained

of being tired and dull, weak and some headache, backache and occasionally nose bleed; that the patient sometimes vomited; that the temperature is usually one or two degrees higher in the evening than in the morning, and as the disease progresses the temperature each day becomes a little higher; that the disease usually runs a very definite course; that it affects particularly the small intestines, which become infected, and the glands of the small intestines become swollen and ulcerated . . . ; that the condition of the intestines causes more or less pain, usually referred to as being in the stomach, although it is more probably located on the right-hand side, between the prominence of the pelvic bone and the navel, up midway between the two, and the pain at this point generally continues throughout the whole course of the disease; that the patient sometimes vomits, and occasionally perforation of the intestine takes place where the ulceration eats through the intestine, causing a shock and collapse followed very shortly by death; that the largest majority of perforations take place about the beginning of the third week of the disease, sometimes in the latter part of the second week.''

On cross-examination this witness further testified that he had knowledge of a disease "urosepsis," which consists of inseption of the urinary tract; that he had never encountered the latter disease; that the disease of urosepsis was to be distinguished from typhoid fever because of the difference in range of temperature; that urosepsis was generally caused by injury to the kidneys; that the symptoms in case the patient died from typhoid fever would be somewhat similar to those of a patient who died from urosepsis, but that there would be sufficient different symptoms to distinguish the two diseases; that peritonitis might set in following the perforation of an intestine in typhoid fever, and might set in as a result of an injury to a kidney.

Dr. Gober further testified, apparently as a fact witness and without objection, that he had attended the deceased four or five times during the month of July, 1913, and a number of times during the month of August, 1913; that he had occasion to visit, and did visit, the deceased once on the 5th and 6th of August, 1913, twice on the 7th, 8th, 9th, 10th, 11th, 12th, and 13th of August, 1913, and three times on the 14th and once on the 15th of August, 1913. Ultimately this wit-

ness further testified, also without objection, "that he usually examined the body of the deceased every day throughout the time he was in attendance upon him, particularly the abdomen; that in making said examination he did not observe any black and blue marks or any spots whatsoever upon the body of the deceased. . . . " But when counsel for the defendant sought to elicit from this witness whether or not he had taken the temperature of the deceased, objection was made and sustained, in effect, upon the ground that whatever information the witness had obtained concerning the condition of the deceased during his illness was acquired in a professional capacity and for the purpose of enabling the witness to prescribe professionally for the deceased, and could not, under the provisions of subdivision 4 of section 1881 of the Code of Civil Procedure, be revealed without the consent of the plaintiff.

Dr. Blair, called as a witness for the defense, testified, apparently in part as an expert and in part as a fact witness. His expert testimony covered the symptoms and results of an injury to the kidneys and the symptoms and results of typhoid fever. With reference to the results of an injury to the kidneys he testified "that in case a kidney were torn loose in the body, the injured condition would be indicated by the general symptoms of shock, collapse, and blood in the urine; that if a kidney were torn loose or ruptured or contused, the patient would be practically incapable of carrying any load at all; if a kidney were injured by a blow or otherwise, it would cause pain, and within a day after the accident the pain would be markedly noticeable by the patient; that if a kidney were injured to such an extent as to result in death, the death would probably occur in one of the three following manners: By a severe hemorrhage or a stoppage of the urine, or in case of a less severe injury, general weakness following lingering sickness; that it would require a very considerable injury to a kidney to cause death within ten days or two weeks after the injury was received; that in case of death resulting thirteen days from the injury to a kidney you would expect to find general swelling of the kidney and an entire stoppage of water, together with signs of hemorrhage in the kidney itself; that typhoid fever frequently causes abscesses which might occur in any part of the body; that typhoid fever is a disease of the blood; the chief localization is in the

bowel, but might localize in any part of the body and cause an abscess; for instance, it might localize in the brain and cause an abscess there; . . . ''

This witness, Dr. Blair, without objection further testified to the fact that he ''called upon and attended Fred Moreno, the deceased, with Dr. Gober about 11 o'clock in the night of August 14, 1913; that Moreno was then in a house at the New Guadalupe Mines; that he obtained the history of the case from Dr. Gober and made a thorough physical examination of the deceased, including an examination of the heart and lungs, and a general examination of the body of the deceased; that he failed to find any black and blue marks, bruises, or any discolorations whatever upon any part of the body of the deceased, either upon the left side or on the back or elsewhere . . . ; that he found no injury or bruise on the head of deceased.'' Finally Dr. Blair was asked by counsel for the defendant if he had determined from his observation and physical examination of the deceased what was the cause of the latter's death, and if so, to state the cause of death. An objection to this question was sustained upon the ground that it was privileged within the purview of subdivision 4 of section 1881 of the Code of Civil Procedure. It is now insisted that this ruling and the ruling rejecting the evidence of Dr. Gober concerning the temperature of the deceased during his last illness were prejudicial error.

This contention, we think, must be sustained. The statute (Code Civ. Proc., sec. 1881, subd. 4) relied upon to support the rulings complained of, as it was written at the time of the trial of the present case, provided that ''a licensed physician or surgeon cannot, without the consent of his patient, be examined in a civil action as to any information acquired in attending the patient, which was necessary to enable him to prescribe or act for the patient; provided, however, that after the death of the patient . . . the administrator of his estate or the surviving spouse of the deceased . . . may give such consent in any action or proceeding brought to recover damages on account of the death of the patient, caused by the negligent or wrongful act of another.'' The purpose of the privilege thus granted by the statute is to protect the patient against the disclosure and consequent publicity of his bodily ailments, and thereby safeguard him against the humiliation and annoyance which would often follow such disclosure.

Therefore the privilege given by the statute is purely personal to the patient and may be waived by him.

Admittedly, the deceased, if he had been alive, could have consented to the giving of the testimony objected to, and clearly such consent might have been expressly or impliedly given. It has been said in effect by a recognized and respected authority upon the law of evidence that a waiver of the privilege may be implied from the conduct of the patient, and that a finding of such waiver must depend upon two considerations, (1) the interpretation to be placed upon the actual conduct of the patient with reference to the exercise of the privilege and the fairness of the situation created by that conduct. In other words, as the author referred to puts it, "a waiver is to be predicated not only when the conduct indicates a plain intention to abandon the privilege, but also when the conduct (though not evincing that intention) places the claimant in such a position with reference to the evidence, that it would be unfair and inconsistent to permit the retention of the privilege. It is not to be both a sword and a shield." (4 Wigmore on Evidence, sec. 2388, p. 3558.) In keeping with this enunciation of the principles underlying the privilege it has been judicially declared that the privilege granted by statutes analogous in spirit, purpose, and phrase to the statute under consideration here is waived by the patient taking the witness-stand and voluntarily testifying in detail concerning the facts, the nature, and the extent of his ailments, or by calling other persons as witnesses in his behalf and requiring them to testify to the same facts. (*Woods v. Inc. Town of Lisbon,* 150 Iowa, 433, [130 N. W. 372]; *Lane* v. *Boicourt,* 128 Ind. 420, [25 Am. St. Rep. 442, 27 N. E. 1111]; *Epstein* v. *Pennsylvania Ry. Co.,* 250 Mo. 1, [Ann. Cas. 1915A, 423, 49 L. R. A. (N. S.) 394, 156 S. W. 699].) This is so because "it is only the secrets of the sick room or of the consultation . . . that the physician is forbidden to reveal, and what is made public by pleadings and evidence in a court of justice can by no possibility be privileged to benefit the party who thus gives it such wide publicity." (*Lane* v. *Boicourt, supra.*)

We are aware that there are to be found authorities dealing with the doctrine of waiver which declare a rule contrary to the rule declared in the authorities here cited and relied upon, but in our opinion the latter rule is more in consonance

with the spirit and purpose of the privilege, and certainly more in accord with the exact administration of justice, for clearly a patient should not be permitted to describe "at length to the jury in a crowded courtroom the details of his supposed ailment and then neatly suppress the available proof of his falsities by wielding a weapon, nominally termed a privilege." (4 Wigmore, sec. 2389, p. 3360.) Any other construction and application of the privilege would, as is aptly illustrated by the author last cited, permit a patient suing for damages for personal injuries to make and sustain a claim obviously unfair somewhat as follows: "One month ago I was by the defendant's negligence severely injured in the spine and am consequently unable to walk; I tender witnesses A, B, and C, who will openly prove the severe nature of my injury. But stay! Witness D, a physician, is now, I perceive, called by the opponent to prove that my injury is not so severe as I claim. I object to his testimony because it is extremely repugnant to me that my neighbors should learn of my injury and I can keep it secure if the court will forbid his testimony." (4 Wigmore, 2389, p. 3359.)

This brings us now to a consideration of the question as to whether or not the plaintiff in the present case was permitted and by her conduct did impliedly waive the privilege granted by the statute. It will be noted that the statute under consideration as it existed at the time of the trial of the present case provided that in actions brought to recover damages on account of the death of the patient caused by the negligence or wrongful act of another, the administrator of his estate or his surviving spouse may consent to the testimony of a physician or surgeon who attended the patient. (Code Civ. Proc., sec. 1881, subd. 4.) The statute itself therefore in terms expressly and affirmatively answers the query as to whether or not the plaintiff was permitted to waive the privilege, and if, as we believe we have shown, the deceased himself had he lived might have waived the privilege by taking the witness-stand and voluntarily narrating the nature, extent, and results of his injuries or by calling other persons to testify to the same effect, then by a parity of reasoning it must be held that the plaintiff here, in the dual capacity of surviving spouse and administratrix of the estate of the deceased, by taking the witness-stand and in conjunction with other persons whom she called as witnesses in her behalf voluntarily

testifying to the nature and extent of the deceased's injuries and all of the facts and circumstances occurring in the sick room and attending the last illness of the deceased likewise impliedly waived the statutory privilege which had been transmitted and committed to her care and keeping. And it cannot be said that by so testifying herself and calling other persons to testify likewise she did not thereby open wide the door to the testimony of the physicians merely because she did not in so many words tell or attempt to tell the cause of the death of the deceased.

This must be so, for it would be indeed inconsistent and unfair to refuse to permit the physicians to testify concerning the temperature of the deceased during his illness and the cause of his death after permitting the plaintiff and her witnesses to narrate not only the physical signs and symptoms of the last illness of the deceased, including the condition of his temperature, but also all of the facts and circumstances attending his illness which, by indirection, were intended and tended to show the cause of the death of the deceased.

The plaintiff and her witnesses by so testifying fully and freely gave publicity to all that ailed the deceased, and thereby, it seems clear to us, broke the seal of privacy privileged by the statute. The procedure thus pursued by the plaintiff, being a voluntary exploitation of the condition of the deceased and the claimed cause of his death, we are constrained to hold that the inquiry into the symptoms exhibited by the deceased and the cause of his death thus initiated by the plaintiff could have legitimately been brought to a close only by the testimony of the attending physicians concerning the same subject matter.

Our conclusion upon this phase of the case makes it unnecessary for us to discuss the effect upon the rulings referred to of the amendment to the statute in question (Code Civ. Proc., sec. 1881, subd. 4), made after the trial of the case in the court below and pending the perfection of an appeal from the judgment to this court, which expressly provides "that the bringing of an action, to recover for the death of a patient . . . by the administrator of his estate, or by the surviving spouse of the deceased . . . shall constitute a consent by such . . . administrator, surviving spouse . . . to the testimony of any physician who attended said deceased. (Stats. 1917, c. 611, p. 954.)

Of course, upon the going down of the case for a new trial, the amendment to the statute just quoted will be the statute in force at the time of the trial, and therefore will cover and control the question of the admissibility of the evidence of the physicians who attended the deceased. It may not be amiss, however, to say that the amendment last referred to indicates that the legislature has finally concluded that "in actions for personal injury the permission to claim the privilege is a burlesque upon logic and justice." (4 Wigmore, sec. 2389, p. 3359.)

Judgment reversed and cause remanded for a new trial.

Richards, J., and Kerrigan, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on February 28, 1918.