[Civ. No. 5618.    First Appellate District, Division Two.—May 27, 1926.]

In the Matter of the Estate of LOUIS J. MAESCHER, Deceased. CHARLES B. MAESCHER et al., Respondents, v. C. F. SAMMANN, Executor, etc., et al., Appellants.

[1] WILLS — CONTEST — UNDUE INFLUENCE—EVIDENCE—FINDINGS.—In this will contest on the ground of undue influence, the evidence was sufficient to entitle the contestants to submit to the jury the issue of undue influence and was a substantial basis for the jury to find in their favor upon that issue.

[2] ID.—MOTIVES — INFERENCES — PROVINCE OF JURY — NONSUIT.—In such proceeding, questions involving motives, and inferences to be deduced from circumstances, are, within reasonable bounds, exclusively within the province of the jury, or the trial court when sitting without a jury, and under the rules regarding the granting of a nonsuit, they must all be resolved, so far as possible, in favor of the contestants; and it is not necessary to prove the exercise of the influence directly upon the testamentary act.

[3] ID.—NATURAL CLAIM OF WIFE — RELATIONSHIP TO TESTATOR — EVIDENCE—UNNATURAL WILL.—In a will contest on the ground of undue influence, although the testator had been living separate and apart from his wife for a considerable period of years, and she was not one of the contestants, testimony regarding said wife, the relations of the testator with her and especially the facts and circumstances which would indicate that she deserved consideration from him and that she had a natural claim upon his bounty, was admissible to show that the will was an unjust and unnatural one.

[4] ID.—UNJUST WILL—PRESUMPTION.—While an unjust will does not of itself raise the presumption of undue influence, the nature of the will may be considered by the jury upon the issue of undue influence as a circumstance.

[5] ID.—STATE OF MIND OF TESTATOR—STATEMENT TO WIFE'S AUNT.— In this will contest on the ground of undue influence, statements made by the testator to his wife's aunt six months before his death, with reference to the acts and conduct of the person alleged to have exercised the undue influence and with reference to his fears, were properly admitted in evidence, where such statements were admitted for the limited purpose of showing the state of mind of

2.  See 26 Cal. Jur. 766.
4.  See 26 Cal. Jur. 690; 28 R. C. L. 148.
5.  See 26 Cal. Jur. 737.

the testator, and the jury was repeatedly instructed that the declarations of the testator were admitted only to show his state of mind and not as evidence of the facts recited.

[6] ID.—REMOTE STATEMENTS—WEIGHT OF EVIDENCE.—The fact that such statements were six months prior to the death of the testator, and were not part of the *res gestae*, went to the weight of such testimony, and not to its admissibility. .

[7] ID.—ISSUES—STATE OF MIND OF TESTATOR.—In a will contest on the ground of undue influence, the state of mind of the testator is germane to the issues of undue influence.

[8] ID.—ADMISSIONS OF ONE PROPONENT—EVIDENCE—ERROR WITHOUT PREJUDICE.—In this will contest on the grounds of undue influence and mental incompetency, the jury having found against the contestants on the issue of mental incompetency, the proponents could not have been prejudiced by any error of the trial court in admitting in evidence, as against all the proponents, testimony to the effect that one of the proponents had admitted on a certain date just prior to the date of the will that she knew the testator's mind had weakened, but that she was relying upon the fact that his brothers did not know this.

[9] ID.—INTIMATE RELATIONSHIP OF PARTIES—EVIDENCE.—In this will contest on the ground of undue influence, testimony of a witness who, six or seven years before the contest, had been employed in the household of the person charged with having exercised the undue influence, and with whom the testator made his home from the time of his separation from his wife until the date of his death, that on one occasion when the testator was in bed on the sleeping porch said person so charged had asked the testator to give her some flats and he said he would not do so, was pertinent as showing the close and intimate relationship of the parties.

[10] ID.—HOME LIFE OF WIFE—UNNATURAL WILL—EVIDENCE.—In a will contest on the ground of undue influence of a person with whom the testator had made his home after his separation from his wife, testimony regarding the latter's attention to her home duties and her devotion and kindness to her husband was properly admitted as casting light upon the naturalness of the testamentary act.

[11] ID.—CITATION OF MINOR—SUBSEQUENT QUALIFICATION OF GUARDIAN—DISMISSAL.—In this contest of a will in which a certain woman and her adopted child were the principal beneficiaries, the citation having been issued to said woman, both individually and as guardian of said minor child, and also to said minor child, and service thereof having been made on said woman, both personally

6.  See 28 R. C. L. 151.
7.  See 26 Cal. Jur. 660.

and as such guardian, and also upon said minor personally, no prejudice resulted to said minor from the fact that at the date of the service of the citation said woman had not qualified as such guardian by filing the necessary bond, but she subsequently did so and thereupon filed an answer for herself and on behalf of her ward; and the court properly denied a motion to dismiss as to said minor, on the ground that no citation was served upon her guardian in compliance with the requirements of section 1328 of the Code of Civil Procedure.

---

(1) 40 **Cyc.**, p. 1145, n. 54, p. 1166, n. 89, p. 1332, n. 46.  (2) 38 **Cyc.**, p. 1553, n. 90; 40 **Cyc.**, p. 1166, n. 88, p. 1331, n. 41.  (3) 40 **Cyc.**, p. 1162, n. 64.  (4) 40 **Cyc.**, p. 1154, n. 27, p. 1160, n. 57.  (5) 40 **Cyc.**, p. 1158, n. 47, 48, p. 1160, n. 55.  (6) 40 **Cyc.**, p. 1157, n. 46.  (7) 40 **Cyc.**, p. 1158, n. 49, p. 1159, n. 52.  (8) 40 **Cyc.**, p. 1359, n. 77.  (9) 40 **Cyc.**, p. 1162, n. 64.  (10) 40 **Cyc.**, p. 1162, n. 64.  (11) 40 **Cyc.**, p. 1252, n. 96, p. 1263, n. 74, p. 1359, n. 77.

APPEAL from a judgment of the Superior Court of Los Angeles County. Walton J. Wood, Judge. Affirmed.

The facts are stated in the opinion of the court.

Milton K. Young, Lyndol L. Young and William K. Young for Appellants.

Courtney A. Teel, Maurice C. Sparling, Theodore Horstman and Clarence Smith for Respondents.

LANGDON, P. J.—This is an appeal from a judgment denying probate to an alleged will of Louis J. Maescher, deceased, which judgment was rendered upon a verdict of a jury that said will was executed by Maescher while acting under the undue influence of Mrs. Lottie Logan, one of the beneficiaries thereunder.

[1] As appellants contend that the evidence is insufficient to support the verdict of the jury and that their motion for a nonsuit made at the conclusion of the contestants' evidence should have been granted, we shall state the facts herein rather fully with emphasis upon testimony supporting the verdict.

Louis J. Maescher married in 1902 and lived with his wife in Los Angeles, until 1912, when he left her, saying he would not return. Mrs. Maescher gave no cause for this action on his part, but, on the contrary, was a de-

voted, industrious wife and was heartbroken when her husband left her. The year before Mr. Maescher left his wife, he met appellant Lottie Logan and about a month after meeting her told her he was a married man. She went about with him to public places of amusement and during this year he would frequently return to his wife's home at 3 and 4 o'clock in the morning. Shortly after leaving his wife Maescher went to live at the home of Mrs. Logan, where he lived until the time of his death, in July, 1923. During a part of this time Mrs. Logan also had other boarders, but during the latter years of Mr. Maescher's life her household consisted of Mr. Maescher, herself and an infant that she had adopted and who was also a beneficiary under the purported will and is an appellant here. During the ten years or more that Mr. Maescher lived at the home of Mrs. Logan there was no definite sum paid by him for his board and lodging. Mrs. Logan testified that she purchased much of his clothing and charged it to her account and paid her own accounts and that when she needed money he would give it to her. On several occasions he gave her large amounts of money and on one occasion gave her bonds of the value of $9,000. During a part of the time that Mr. Maescher lived with Mrs. Logan he occupied a sleeping porch off her bedroom and was obliged to pass through her room to reach the bath. At the time of his death Mr. Maescher was living with Mrs. Logan in a four-room house owned by her.

At various times during the relationship of these people Mr. Maescher was seriously ill and during the last three months of his life he declined very noticeably and no longer attended to business duties. During this period he was almost constantly with Mrs. Logan. Neighbors who saw him daily testified that during the last few weeks of his life he failed both physically and mentally. About a week prior to his death he spent the night with a neighbor and appears to have become hysterical or mentally unbalanced during the night. Mrs. Logan was sent for and took him to her home. Several days later, on Saturday, June 16, 1923, Mrs. Logan went to the home of this neighbor, Mrs. Langworthy, to use her telephone. Mrs. Langworthy and other persons present on this occasion testified that Mrs. Logan was greatly distressed and excited and stated that this was because she had just learned that Mr. Maescher had not made a will;

that she had thought he had provided for her and the baby. She telephoned to the attorney who afterward drew the will and not being able to reach him, she telephoned to Mr. Sammann, the business manager for Mr. Maescher. She also failed to find him in his office, but left word for him to come to her home. During the conversation between Mrs. Logan and Mrs. Langworthy the latter suggested to Mrs. Logan that Mr. Maescher was incompetent to make a will and instanced the recent occurrence at her home when he had been mentally unbalanced. Mrs. Logan agreed to this, but said that Maescher's brothers were not aware of his condition. It is admitted that late that afternoon Sammann and the attorney came to Mrs. Logan's home and the contents of the will were discussed with Maescher.

On June 19, 1923, Mr. Maescher was taken to the office of the attorney by Mr. Sammann and there he signed the will which contained the provisions he had directed upon the previous Saturday, according to the testimony of the attorney. Under its provisions $5,000 was left to the wife of testator with the condition that if she contested the will she was to receive but $5. Twenty thousand dollars was left to Mrs. Logan and the balance of the estate of the value of nearly $150,000 was left to Lois Frances Logan, the adopted child of Mrs. Logan.

The contest over the probate of the will was instituted by the brothers and sisters of deceased and the jury found that the will was executed under the influence of Mrs. Logan. The facts we have set forth herein are outstanding ones in the record, but they by no means include all the matters which the jury might well have considered as fortifying their conclusion. The record shows that at the time of Maescher's death Mrs. Logan had succeeded in accumulating a fortune of over $100,000; that he had given her real property, bonds, money, jewelry, and his insurance policies. Their relations were certainly most confidential and she had constant opportunity during the last few weeks of his life when he was weakened mentally and physically to influence his actions. It has repeatedly been held that opportunity and inclination to influence a testator are not in themselves sufficient showing of undue influence, without some participation by the person having such opportunity and inclination in the making of the will. But we have in the record before

us the testimony of several disinterested witnesses regard= ing Mrs. Logan's concern and excitement when she learned no will had been made by Maescher, her statement that she thought a will had been made providing for her and her child, her attempt, on July 16th, to communicate with Mr. Young, the attorney, and with Mr. Sammann, Mr. Maescher's man- ager, who afterward assisted her in her efforts to probate the will, the arrival of these two persons at her home on the afternoon of that day and the conference with Maescher about his will, which resulted in its execution three days later, which was about ten days prior to his death.   There are additional facts and circumstances indicating that the testator's state of mind shortly before his death and while free from the influence of Mrs. Logan was opposed to the disposition of his property made in his will and indeed to the making of a will at all.  In conversation with his wife's relatives he revealed his desire to provide for his wife, and to avoid making a will, thus allowing his property to go to his heirs at law.

The foregoing evidence was sufficient to entitle the con- testants to submit to the jury the issue of undue influence and was a substantial basis for the jury to find in their favor upon that issue.

[2]  "Questions involving motives, and inferences to be deduced from circumstances, are, within reasonable bounds, exclusively within the province of the jury, or the trial court when sitting without a jury, and under the rules regarding the granting of a nonsuit, they must all be resolved, so far as possible, in favor of the contestants." (*Estate of Arnold,* 147 Cal. 583, 589 [82 Pac. 252].)   "In many cases it is utterly impossible to prove the exercise of the influence di- rectly upon the testamentary act, but this is not necessary." (*Estate of Snowball,* 157 Cal. 301 [107 Pac. 598].)

Of course, there is testimony in the record relied upon by appellants which is in conflict with that above recited.   The testimony regarding the circumstances surrounding the mak- ing of the will is not so greatly in conflict.   Mr. Sammann stated that he came to Mrs. Logan's home on Saturday after- noon, June 16th, in response to a telephone message left for him at his home.   This is in harmony with the testimony that Mrs. Logan left word for him to come to her home. He stated that when he arrived Maescher wished to make

his will and that he, Sammann, thereupon telephoned to the attorney, who came to the house. His visit was also in accordance with Mrs. Logan's purpose, for she had telephoned to him earlier in the day and failed to find him.

[3] Appellants object to the testimony in the record regarding the wife of deceased, his relations with her and especially the facts and circumstances which would indicate that she deserved consideration from him and that she had a natural claim upon the bounty of testator. This objection is made because the wife was not one of the contestants. However, that fact does not destroy the relevancy of the evidence offered. The evidence was offered to show that the will was an unjust and unnatural one. [4] While an unjust will does not of itself raise the presumption of undue influence, the nature of the will may be considered by the jury upon the issue of undue influence as a circumstance. (*Estate of Snowball*, 157 Cal. 303 [107 Pac. 598]; *Estate of Gallo*, 61 Cal. App. 174 [214 Pac. 496].)

[5] Objection is made to evidence of statements made by testator six months before his death to his wife's aunt, to the effect that Mrs. Logan was trying to force him to get a divorce from his wife and marry her; that he did not wish to do this; that he was afraid Mrs. Logan would put him out of her house if he did not and similar statements. These statements were admitted for the purpose, and restricted by the court to such purpose, of showing the state of mind of the testator. · For such limited purpose they were admissible. Declarations of a testator which reveal his condition of mind are admissible for that purpose, although not a part of the *res gestae*, but their effect must be carefully limited to the question of his condition of mind, and they must not be considered as narrations of the exercise or effect of the undue influence. (*In re Calkins*, 112 Cal. 301 [44 Pac. 577]; *Estate of Arnold*, 147 Cal. 593 [82 Pac. 252].) In the instant case the jury was repeatedly instructed that the declarations of the testator were admitted only to show his state of mind and not as evidence of the facts recited.

[6] Appellants contend that, although this evidence may have indicated the mental state of testator six months before his death, that mental state is not germane to the issues, and that the incidents narrated were too remote in time to illuminate the state of mind of testator at the time of the

testamentary act.. .We think the latter objection goes to the weight of the testimony. In 28 Ruling Case Law, page 151, it is said: "On the issue of undue influence, declarations of a testator are admissible in evidence when they are part of the *res gestae,* but it. is not essential that statements made by him should be of the *res gestae* to render them admissible, though their value as evidence diminishes in proportion as they are remote from the date of the will."

. [7] As to the objection that the state of mind of the testator was not germane to the issue of undue influence, the matter is thus analyzed in an authoritative text on Evidence: "Where undue influence or fraud is the issue, three uses of the evidence present themselves. The testator's utterances . . . may be offered either as indirect evidence of the testator's condition of mind-weakness, susceptibility to importunities, and the like—or as declarations of a state of mind (under the present exception)—assertions of affection or dislike, etc.,—and are thus admissible; his condition of mind, intelligence and strength of purpose, feelings toward this or that person, being all circumstances which bear on the fact of undue influence; the propriety of this use is universally recognized.

"Again, the question whether a will was made under undue influence is, in one respect, a question whether the testamentary intentions and wishes represented in it are the normal ones of the testator, or whether, relatively to his known usual and constant state of mind, they are abnormal. It thus becomes important to learn what was the normal condition of his affections, wishes and testamentary intentions, for the purpose of establishing this standard of normality. As evidence of these affections, intentions, etc.— either by circumstantial inference or under the present exception for declarations of a state of mind—his utterances at various times before or after execution (including expressions of affection or the opposite, previous wills or statements of intention, etc.) may be resorted to. This use of such evidence is also universally accepted." (1 Greenleaf on Evidence, 16th ed., p. 261 et seq.)

[8] Appellant objects to the admission of the testimony of Mrs. Langworthy to the effect that Mrs. Logan had admitted on Saturday, June 16th, that she knew Maescher's mind had weakened, but that she was relying upon the fact

that his brothers did not know this. It is objected that this statement of Mrs. Logan could not bind the other beneficiaries under the will and was not admissible against them. This objection is undoubtedly sound. However, as this evidence was directed to the issue of mental incompetency, upon which the jury has found against the contestants, no prejudice has resulted to the beneficiaries under the will. That issue and the evidence upon it have not been discussed herein because the special verdict of the jury upon that question has eliminated it from consideration here.

[9] Objection is made to certain testimony of the witness Mary Graham. She had been employed in Mrs. Logan's household six or seven years before the will contest. . She testified that on one occasion when Mr. Maescher was in bed on the sleeping porch Mrs. Logan asked him to give her some flats which he owned and he said he would not do so. Contestants had set forth in their pleading and attempted to prove a continuous course of conduct on the part of Mrs. Logan and the exercise of a strong influence over Maescher from the time he first met her until his death. Their theory was that Mrs. Logan separated Maescher from his wife and gradually and steadily persuaded him to transfer his property to her until she had acquired a large fortune and then, when he was weakened in mind and body, influenced him to make a will, leaving substantially all the balance of his property to her and her adopted child. The testimony of Mrs. Graham was a link in that alleged chain. If its reception was not justified because of the peculiar theory of the case, nevertheless we think it was pertinent as showing the close and intimate relationship of the parties. Certainly such a request on the part of Mrs. Logan demonstrated such relationship. The nature of the relationship between a testator and one charged with having unduly influenced him in making a testamentary disposition of his property is always a proper subject matter for investigation by the jury.

[10] The testimony of the sister of Mrs. Maescher regarding the latter's attention to her home duties and her devotion and kindness to her husband cast light upon the naturalness of the testamentary act. It has repeatedly been held that the injustice and unnaturalness of a will are circumstances to be considered in resolving the issue of undue influence. It would be more unnatural to disinherit a

blameless, devoted wife than to disinherit one who had given the testator cause for complaint.

[11] It is contended that the motion to dismiss the action as to Lois Frances Logan, a minor, should have been granted upon the ground that no citation was served upon her guardian in compliance with the requirements of section 1328 of the Code of Civil Procedure.

The citation was issued to Lottie T. Logan, Lottie T. Logan, as guardian of Lois Frances Logan, a minor, and Lois Frances Logan, a minor. Service was made upon Lottie T. Logan, for herself personally, and she was also served as said guardian. Service was also made upon the minor personally. Lottie T. Logan was the natural guardian of said child, having adopted her. Mrs. Logan had also applied for letters of guardianship to care for the estate of said child, at the date of the issuance of the citation. The objection to the service is made by the appellants because Lottie T. Logan had not qualified as such guardian of the estate of Lois Frances Logan by filing the necessary bond at the time the citation was served upon her. While this fact creates an irregularity in the service, no prejudice resulted to the minor therefrom under the facts of this case. Less than a month after said service Mrs. Logan was appointed guardian *ad litem* of the minor and thereupon filed an answer for herself and on behalf of her ward as said guardian *ad litem*.

In *Estate of Simmons,* 168 Cal. 390, 395 [143 Pac. 697], the court says: "It seems entirely clear that, under this statutory scheme, jurisdiction of the subject matter of the contest is vested in the court by the filing of the petition. Mr. Justice Temple in his concurring opinion in *San Francisco Protestant Orphan Asylum* v. *Superior Court,* 116 Cal. 443 [48 Pac. 379], expresses the view that the proceeding is one *in rem* and that service of a citation might have been omitted from the statutory procedure because not essential to jurisdiction of the *res.* But if it be thought that service of the citation has any bearing on the jurisdiction, its office can be only that of a summons in a civil action, viz., to give jurisdiction of the persons of those whose rights would be affected by revocation of the probate. A voluntary appearance would dispense with the necessity of service (*Abila* v. *Padilla,* 14 Cal. 106; *Estate of Ricks,* 160 Cal. 467 [117 Pac. 539]). While the issuance of citation within the year is requisite

to the maintenance of the contest, and a failure to have it thus issued would *in the absence of an appearance* by adverse parties, justify the dismissal of the contest (*Estate of Hite,* 155 Cal. 390 [101 Pac. 8]; *Estate of Ricks,* 160 Cal. 467 [117 Pac. 539]), the proceeding is none the less commenced by the filing of the petition, and the court's jurisdiction of the contest attaches upon such filing. *Bacigalupi* v. *Superior Court,* 108 Cal. 92 [40 Pac. 1055], relied on by respondent, merely holds that, where the petition for revocation had been dismissed, the court was without jurisdiction, after the expiration of a year from probate, to revive the lapsed petition and order a citation issued.''

The other objections urged by appellants are unsubstantial. We find no error in the record warranting a reversal of the judgment, and the same is affirmed.

Nourse, J., and Sturtevant, J., concurred.

A petition by appellants to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on July 26, 1926.

Seawell, J., and Shenk, J., dissented.