[Civ. No. 6234. Second Appellate District, Division Two.—December 20, 1928.]

In the Matter of the Estate of BASIL VISAXIS, Deceased. GEORGE C. VISAXIS, Respondent, v. MARIA B. VISAXIS, Appellant.

E. C. Pyle for Appellant.

George Beebe and Lyon, Fleming & Robbins for Respondent.

WORKS, P. J.—This is an appeal from an order or judgment revoking the probate of a certain will and admitting to probate an earlier will made by the decedent. The will affected by the revocation was executed October 8, 1926. The earlier will was executed August 3, 1922. The testator died October 19, 1926.

The contestant through whose efforts the probate of the will of 1926 was revoked, the respondent here, was not an heir at law of the testator, but he was a legatee under the will of 1922. Section 1327 of the Code of Civil Procedure provides: "When a will has been admitted to probate any person interested may . . . contest the same or the validity of the will." Appellant contends that respondent is not a "person interested" within the meaning of the section, especially as the will of 1922 had not been admitted to probate before the contest of the will of 1926 was instituted. This contention is directly nullified by what the supreme court said in *Estate of Langley*, 140 Cal. 126 [73 Pac. 824]. In that case an earlier will had been offered for probate and the proceeding was yet pending when the contest of a later document was sustained. It was determined that under such circumstances the interest of a devisee under the earlier will was sufficient to entitle him to contest the later one. Here the earlier will was offered for probate in connection with the contest upon the second one, and it was admitted to probate by the judgment from which the present appeal is prosecuted. On the point here presented see, also, *Ruth* v. *Krone*, 10 Cal. App. 770 [103 Pac. 960]; *Estate of Land*, 166 Cal. 538 [137 Pac. 246]; *In re Phillips' Estate*, 202 Cal. 500 [261 Pac. 709].

It is insisted by appellant that the trial court was without jurisdiction to proceed with a hearing of the contest for the reason that the citation mentioned in sections 1328 and 1329 of the Code of Civil Procedure was not served upon all the legatees under the will of 1926.

We can see no reason why a will contest should not proceed as between the contestant and those upon whom the citation is served. ■ It is settled that jurisdiction over a will contest attaches upon the filing of the petition (*Estate of Maescher*, 78 Cal. App. 189 [248 Pac. 537], and cases cited), and the supreme court has said, in language, however, apparently unnecessary to a decision of the case before it: "It is not, as we understand it, and cannot be successfully claimed that the trial court was without jurisdiction to proceed with the trial as to contestant and such defendants as had been served with citation" (*Estate of Land, supra*). We think the point presented is not tenable.

■ At the commencement of the trial appellant moved the court, under a notice of motion previously given, for an order bringing in a new party. This party was a legatee under the will of 1922, being situated exactly as was contestant in an interest in a denial of probate to the will of 1926. The motion to bring him in as a party was denied, and appellant contends that the ruling was error. Section 389 of the Code of Civil Procedure, concerning civil actions, provides that "when a complete determination of the controversy cannot be had without the presence of other parties, the court must then order them to be brought in," and appellant argues her point upon an assumed analogy furnished by the section. The supreme court has thus construed the enactment: "This section does not give the court power to bring into the action for determination a controversy between a defendant and strangers to the action which is irrelevant to the action between the parties already before it, except for the purpose of making its determination of the controversy between the parties already before it complete, and without prejudice to the rights of others. A defendant cannot inject into the action a controversy between himself and an outsider, even though it affects the property to which the action relates, unless some party already before the court is interested in, or will be affected by, the determination of such controversy" (*Alpers* v. *Bliss*, 145 Cal. 565 [79 Pac. 171]). The ruling of the trial court was not error.

■ The ground of contest of the will of 1926 was that, at the time of its execution, the testator was not of sound and disposing mind and memory. Two physicians, Dr. Hommel and Dr. Freytag, testified upon this issue. For

several months preceding his death the testator had been afflicted with a tumorous or cancerous growth on his tongue and was a victim of syphilis. Dr. Hommel testified that the condition of the testator's tongue had no effect on his brain cells, and Dr. Freytag said that on the morning of October 8th, the day upon which the second will was executed, the testator was of sound mind. This testimony of both witnesses, as well as other statements of a similar nature, was. stricken out by the court, and it is insisted that the ruling was erroneous. Dr. Hommel treated the testator for the diseases above mentioned from June 16th to September 22d. Dr. Freytag, who was Dr. Hommel's assistant, acted in a similar capacity from September 23d to October 12th. Both physicians testified that syphilis, in some of its stages, may affect the mind.

Subdivision 4 of section 1881 of the Code of Civil Procedure, as it stood when the contest was tried—for it has been amended since that time in certain particulars—provided that a physician cannot, "without the consent of his patient, be examined . . . as to any information acquired in attending the patient, which was necessary to enable him to prescribe or act for the patient." It appears to us that the testimony of the physicians which was stricken came directly within the inhibition of the statute, for it related to and was based upon information acquired during attendance upon the testator and which was necessary to enable them to treat him.

Appellant contends, however, that the right to object to the testimony of the physicians was waived by contestant, for the reason that contestant himself had introduced evidence, before Drs. Hommel and Freytag took the stand, which in effect estopped him to object to their testimony. Early in the presentation of contestant's case he offered one Xydias as a witness. This man testified that he had been a friend of the testator in his lifetime; that he and his wife, prior to the illness of the testator, had been going "almost twice or three times a week" to call at the house of the testator, and that during the illness they went there "almost every day, maybe miss a day or two between," and that the illness began in June or July. The witness was asked: "Did you observe the treatments he was having?" The answer: "Well, I know the treatments he was having, he has some injections with, I recollect, '606,' and he has some

radium treatments about four, sixteen hours, and some X-ray treatment. . . . I was present.'' Xydias then testified that he accompanied testator ''on the occasions that he had these treatments,'' and he proceeded: ''Well, right on the beginning of his sickness he came to my house and he asked me to introduce him to my doctor, because he was a throat specialist, and at that time he had a cancer on the tongue and, of course, he didn't know his sickness, so he told me to bring him to my doctor. So I did, to Doctor Hommel, on Hollywood Boulevard, and the next day when we make the appointment I was pretty busy so I send my wife there to go with him and, of course, they did that. The first time the doctor saw him he said, 'I can't say the kind of disease you have, but the only thing I have to take your blood for examination and then I can tell you the correct disease.' '' The witness said a little later: ''He has this '606'; he has the radium treatment, and he has some X-ray treatments.'' Later still the record shows this: ''Q. Well, when was he taking this '606'? A. Well that is the injections he was taking on the first part of June'' (here an objection was made that the witness did not know what ''606'' is, but it was overruled) ''and later on the doctor say, 'Well, your physical condition is very strong,' and prescribed six more additional and, of course, besides some iron. Now, of course, I didn't know anything about it and the deceased told me, and the doctor, too.''

Appellant also directs attention to the fact that contestant offered in evidence the certificate of the death of the testator. This paper showed the cause of death to be ''Pneumonia Lobar,'' with the contributory causes, ''Ca. of Tongue with metastases also Lues,'' and the treatment administered, ''radium & anti-syphilitic.''

We think that from the quoted testimony of Xydias and the death certificate the jury could not have failed to understand the nature of one of the afflictions from which the deceased was suffering. It is a matter of common knowledge that ''606'' is a frequently employed name for salvarsan, a specific used in the treatment of syphilis. Xydias said that this remedy was administered to the testator by means of ''injections,'' and it is commonly understood that syphilis is treated in that manner. The death certificate showed that one of the causes contributing to the testator's death was ''lues.'' The meaning of this term is possibly not so well

understood as is the meaning of the expression "606." The dictionary defines it as "syphilis." The showing of the certificate as to the nature of the treatment rendered the patient is particularly graphic. The character of the testator's horrible ailment was communicated to the world by the witness and by the death certificate, in an open courtroom, even if in some terms that all present did not understand. We have not quoted all of Xydias' testimony concerning the cancerous condition in the testator's mouth, for he did refer to that condition. No such quotation is necessary as the record is full of references to the condition, from the testimony adduced on both sides of the contest, and everyone in the courtroom was bound to know of the existence of that affliction in the testator. Under these circumstances it is to be said that the contestant waived the right to object to the testimony of the two physicians on the ground of privilege?

■ It is to be understood that this is not a question whether the testator waived the privilege during his lifetime. Appellant does not make that point. Still, as a basis for the settlement of the point which is made it is not impertinent to observe that the books are full of cases to the effect that a patient who has consulted a physician, the client who has consulted a lawyer, or the parishioner who has confessed to a priest, may deprive himself of the protection afforded by the law of confidential communications if he discloses the same matters to others who do not come under the ban of that law. The citation of authority upon this point is wholly unnecessary. We think, as the beneficiary of the privilege may thus waive his right, that there is from that circumstance reason to say that one situated like the contestant here may waive the right to object to testimony on the ground of privilege, by a disclosure in court of the privileged matter himself. The privilege exists, on grounds of public policy which are well known, for the purpose of keeping from the public those matters which come within the law of confidential communications. ■ It would seem that one who might otherwise object on the ground of privilege is estopped to do so when he has introduced evidence which discloses the very intelligence which he claims is privileged. There appears to us to be a close analogy between this point and another which has frequently been decided. ■ Where one introduces evidence of certain

facts he waives the right to object to the offer of evidence of the same facts by his opponent (*South St. Louis Ry. Co.* v. *Plate,* 92 Mo. 614 [5 S. W. 199]; *Hobbs* v. *Board,* 116 Ind. 376 [19 N. E. 186]; *Chicago, K. & N. Ry. Co.* v. *Wiebe,* 25 Neb. 542 [41 N. W. 297]; *Carstens* v. *Stetson & Post Co.,* 14 Wash. 643 [45 Pac. 313]; *Warren Live Stock Co.* v. *Farr,* 142 Fed. 116; *Starcher* v. *South Penn Co.,* 81 W. Va. 587 [95 S. E. 28]; *Adams* v. *Ristine,* 138 Va. 273 [31 A. L. R. 1413, 122 S. E. 126]; *Peter & Burghard Co.* v. *Marion Bank* [Ind. App.], 149 N. E. 79]; *Jameson* v. *Tully,* 178 Cal. 380 [173 Pac. 577]). We think the trial court erred in striking out the testimony of Dr. Hommel and Dr. Freytag.

The contest was tried by a jury. Appellant requested the trial judge to give the following instruction, but the request was refused: "The court instructs you, that the law always presumes a person to be sane, and the burden is upon the contestant of the will of the deceased to show affirmatively, and by a preponderance of the evidence, that the testator was of unsound mind at the very time he executed the will. Insanity exists as a matter of law only from the time it is shown to exist, and proof of subsequent insanity on the part of the testator will not create, nor will it carry a presumption of its past existence."

We think, because of the last sentence in this proposed instruction, the trial judge acted properly in refusing to give it. If the sentence could be construed to mean that proof of subsequent insanity *alone* would not have the effect stated in the latter part of the sentence, it might be proper in a case in which only that sort of proof was before the jury, but that point we are not called upon to decide. In this contest there was testimony, relating to periods both before and after the execution of the will, that the testator was of unsound mind. If the instruction had been given to the jury we think it must have been understood by the members of that body as forbidding them to consider evidence of the testator's condition of mind after the will was executed, and as so understood the sentence in question is an incorrect statement of the law. "Evidence as to mental condition before and after the execution of the will may be relevant and admissible, but it is important only in so far as it tends to show mental condition at the time of executing the testamentary document. That is to say, facts as to mental

condition, whether anterior or subsequent to the date of the execution, depend for their probative force upon the clearness and certainty with which they tend to demonstrate the condition of mind and memory at the moment the will is executed" (*Estate of Sexton,* 199 Cal. 759 [251 Pac. 778]). Language to the same effect is to be found in *Estate of Smith,* 200 Cal. 152 [252 Pac. 325]. It is true that in *Estate of Perkins,* 195 Cal. 699 [235 Pac. 45], the court said: "Insanity exists as a matter of law only from the time it is shown to exist and proof of subsequent insanity will not create nor carry a presumption of its past existence." Immediately above this statement, however, and on the same page of the report, the court said: "Evidence as to mental condition before or after the execution of the will is important only in so far as it tends to show mental condition at the time of the execution of the will." *Estate of Perkins* is cited as authority for the above quotation taken from *Estate of Sexton.* The law is well settled that a judge properly refuses a proposed instruction if any statement contained in it should not have been given to the jury (*People v. Lips,* 59 Cal. App. 381 [211 Pac. 22]).

The judge also refused to instruct the jury that "an uncle is under no obligations to provide for his nephews, either when living, or by will, and failure to name them, or any of them, in the will, does not under the law, raise. the presumption that they were forgotten." This instruction was offered for the reason that respondent was a nephew of the testator.

It is said in *Estate of Keegan,* 139 Cal. 123 [72 Pac. 828], a will contest, that it was not error to give the same instruction here requested. The purpose of this instruction is partially shown by the latter portion of it, and we think that if it was not improper to give it in the case cited for the reason indicated, there is additional reason why it should have been given here. The contestant was a nephew of the testator, and the evidence disclosed that fact to the jury. The interest which was sufficient to entitle him to file the contest, as we have above pointed it out, was unknown to the jury. It was not mentioned in the instructions. At any rate, the giving of the proposed instruction would have aided in disabusing the members of the jury of an impression they may well have had, to the effect that the contest was in-

stituted under some right that the contestant had as a nephew. It was decided in *Estate of Martin,* 170 Cal. 657 [151 Pac. 138], that it was error to refuse to instruct the jury, the proceeding being a will contest, that "the heirs of the deceased had no vested rights in the property of their ancestor because of their relationship." As it was held necessary there to caution the jury that the "heirs" had no vested interest in the property of the testator, we think, for the reasons already stated, that it was necessary here to instruct the jury as requested. ▮▮▮▮ The court instructed the jury as follows: "In determining the mental condition of the deceased at the time of making the will, it is proper to take into consideration evidence surrounding those who in the absence of the Will would be the natural and legal ob-. jects of his bounty. You have a right to take into consideration the fact that he had a brother, and evidence of the relations existing between them, and in showing his state of mind, of any evidence there may be of his reasons for not providing adequately for him in his Will, and whether such reasons were based on delusions or not." This instruction did not, we think, cover the matters stated in the proffered instruction that was refused. In truth, the first sentence of the given one may possibly have confused the jury on the very point as to which it was designed to inform them by the refused one.

▮▮▮▮ The trial judge refused to give the following instruction, requested by appellant: "The court instructs you relative to the testimony of the subscribing witnesses to the will, that the law presumes that such subscribing witnesses had their attention directed to and noted the mental capacity of the testator, and that by reason thereof, their opinion is entitled, and you should give the same in your consideration of the evidence more weight than you would give to the opinion of a witness who was merely passive."

The substance of this proffered instruction is stated to be the law in *Estate of Holloway,* 195 Cal. 711, 733 [235 Pac. 1012], and the statement was repeated in *Estate of Mc-Donough,* 200 Cal. 57 [251 Pac. 916]. As the instruction was designed to inform the jury as to the law, it was error to refuse to give it.

▮▮▮▮ Appellant presents, in various forms, the point that the evidence was insufficient to support the verdict.

We think the record shows a conflict, and the point therefore is not well taken.

■ Respondent, in view of the possibility that error might be found in the record, invokes the provisions of section 4½ of article VI of the constitution, which is to the effect that a reversal of a judgment shall not occur "unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." We have examined the entire cause, including the evidence, and think a miscarriage of justice may reasonably have been occasioned by the errors of the trial court. An undoubted preponderance of the evidence tended toward proof of the testamentary capacity of the testator. If we are to judge from the printed page, this is one of those will contests, so frequently mentioned by courts of review, in which juries have overturned wills upon very doubtful reason.

Judgment reversed and contest remanded for a new trial.

Craig, J., and Thompson (Ira F.), J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on January 18, 1929, and a petition by respondent for a rehearing of this cause was denied by the district court of appeal on February 18, 1929.