[Civ. No. 10820.   First Appellate District, Division One.—November 30, 1939.]

MARGARET SMITH et al., Respondents, v. MORRIS J. SCHWARTZ, Appellant

Kirkbride & Wilson for Appellant.

Francis N. Foley for Respondents.

GOODELL, J., *pro tem.*—The collision which gave rise to this litigation resulted in the instant death of Frederick Smith, who was the father of the three respondents, and in severe injuries to Lorraine Smith, one of them. An action filed by Lorraine Smith against the appellant for her personal injuries was tried by the late Judge Swart without a jury and resulted in a $7,000 judgment which, on appeal, was affirmed. (*Smith* v. *Schwartz*, 14 Cal. App. (2d) 160 [57 Pac. (2d) 1386].) The present case, brought by the three daughters and heirs of the deceased Frederick Smith for damages for the death of their father, resulted in a verdict for $10,000. The appeal is from the judgment entered upon that verdict.

Between four and five o'clock on December 24, 1931, a Buick automobile driven by the appellant, traveling southerly along Bayshore Highway collided with a Studebaker automobile driven by said Frederick Smith on Bayshore Highway at its junction with Winchester Drive at Burlingame. The Studebaker had been headed northerly and had made, or was making, a left turn to go westerly on Winchester Drive when it was struck on its right side near the front by the front of appellant's Buick in the westerly southbound lane. Bayshore Highway has four ten-foot traffic lanes, the two westerly lanes being for southbound, and the two easterly ones for northbound, traffic. There is a fairly wide shoulder on each side.

The impact was a violent one. When the cars came to rest the Studebaker was lying on its right side pointed easterly toward the bay, southerly of the Buick, and under it were pinned its driver and his daughter Lorraine who had been riding beside him. The Buick, still on its wheels, was pointed northerly, the direction from which it had come. Winchester Drive is sixty feet wide over all with an asphalt pavement for vehicular traffic thirty feet wide, but the curb lines on the edges of the pavement flare out so that where they touch the westerly edge of Bayshore Highway the width of the mouth of Winchester Drive is approximately one hundred feet. Rain had fallen just before the collision and the highway was wet; the day was dull and overcast but the visibility was good.

In the first case there was no issue of contributory negligence and could have been none, for even if Lorraine Smith's father had been guilty of negligence it could not have been imputed to her, and this court so held in deciding that case. In the instant case, however, the issues are different. Contributory negligence of the respondents' father was pleaded, and at the trial most of the evidence was addressed to that defense.

There was the sharpest possible conflict between the plaintiffs' witnesses who saw the collision and those of the defendant who saw it. Briefly, the plaintiffs' witnesses on the one hand testified that the Studebaker had gone from the outer to the inner lane, northbound, and at a speed of from twelve to fifteen miles an hour had made the left turn northerly of the center of the intersection, while the Buick, traveling over fifty miles an hour was still a considerable distance away. On the other hand, the appellant and his wife testified that they had seen the Studebaker some two hundred fifty feet away; that it was traveling as fast as they were and coming at them "like a locomotive" and that it suddenly made the left turn into and across their path at a distance of some *fifty or sixty feet south of the intersection*. The two versions presented a sharp issue which, of course, was purely a jury question. There is no conflict in the testimony, however, as to the force of the impact. Witnesses for both sides saw the Studebaker in the air. In addition to oral evidence, the position of the cars after the collision, the glass and other debris surrounding them, and skid marks on the highway, were circumstances relied upon by the appellant in an effort to con-

vince the jury that the collision was south of the center line of the intersection, which would mean, of course, that the Studebaker had "cut the corner".

◼ The appellant's first contention is that the testimony of three of respondents' witnesses "materially changed to obviate deficiencies pointed out in a former decision, without sufficient explanation given, is discredited as a matter of law and will be disregarded". We cannot agree with this position. The witness against whose testimony the attack is chiefly directed was an eye-witness, and at the first trial in 1934 marked the map then in use to illustrate her testimony as to the manner in which the Studebaker made the left turn, and was vigorously cross-examined at that trial respecting her delineations as well as respecting what she said. At the 1937 trial a different map was in use and she marked it, and was confronted with the testimony she had given in 1934 and with the old map. There were some changes in her delineations, and under cross-examination she explained that the maps were different, and that the relative distances looked different to her. These changes do not appear to us nearly so glaring as appellant's counsel contends. Another one of respondents' witnesses testified in 1934 that when the cars came to rest there was a distance of about twenty feet between them, while at the 1937 trial he testified that they were from fifty to one hundred feet apart. When confronted with this he answered that it seemed to him *then* (in 1937) that they were about as far apart as "the length of this courtroom", but the record does not disclose what that was. The jury, of course, could see for themselves. The third witness at the first trial, whose testimony is criticized, had testified that when he first saw the Studebaker it had *commenced* to make the left turn and at the last trial he testified that it had *completed* the turn. He was thoroughly cross-examined on this as well as upon his delineations. It is interesting to note that there were changes in testimony made by appellant's witnesses as well. One of them in 1937 testified that he was traveling at about forty-five miles an hour behind appellant's car and gradually overtaking it. In 1934 it was developed by his cross-examination then, that he had admitted that appellant's car might have been traveling as fast as forty-eight or forty-nine miles an hour. Another of appellant's witnesses in 1937 testified that the Studebaker, after the accident, was

fifty or sixty feet south of Winchester Drive, while at the first trial he had testified that it was only twenty-five or thirty feet south of the Buick, which was an inconsistency. It must be assumed that these five witnesses on both sides, all of whom were disinterested, were equally honest. There is no more basis for the claim that respondents' witnesses changed their testimony wilfully than that the appellant's witnesses did so. At the time of the last trial almost six years had elapsed after the accident, and more than three years had elapsed after the first trial. But be that as it may, any variations or inconsistencies in their testimony between the two trials in legal effect would be no different than such variations or changes as are developed between testimony given at a pretrial deposition, for instance, and that given later in a courtroom. It is an every day occurrence in the trial of cases that witnesses are confronted with statements made by them elsewhere, whether under oath or not, and it is always a question of fact for the jury to decide as to which statement is correct, or is more in accord with the probabilities, as well as for the jury to say whether the witness has wilfully changed the testimony, in which case, presumably, the jury rejects it. Who can say, in the instant case, but that the jury was just as critical of the changes in the testimony of appellant's witnesses as appellant's counsel now is of the changes in the testimony of respondents' witnesses. The implication from their verdict is that they were more so. After all, the weighing of all this evidence on both sides was the jury's own function. It involved the attempted impeachment of witnesses. The trial judge heard it and heard a motion for new trial and we fail to see how this case presents a question of law on appeal any more than any other case where there is impeaching testimony in the record.

There is, however, an altogether different answer to this contention. It might well be that the jury, because of the matters just discussed, or for other reasons, concluded that the driver of the Studebaker had, in fact, "cut the corner" and hence had been guilty of contributory negligence, but that such negligence did not directly or proximately contribute to the accident. This argument is made by counsel for respondents (citing *Ingram* v. *Wessendorf*, 14 Cal. App. (2d) 16 [57 Pac. (2d) 989]), and appellant's counsel concedes that "This elementary principle needs no citation of authority".

The question, however viewed, was purely one of fact for the jury.

■ The appellant contends that "The trial court committed prejudicial error in admitting into evidence the testimony of Linda Holzwarth given in the trial of a former case" on the grounds, first, that the parties in the two actions were not the same, and, second, that the foundation for the admission of her former testimony was insufficient.

Section 1870, Code of Civil Procedure, provides that " . . . evidence may be given upon a trial of the following facts: . . . 8. The testimony of a witness deceased, or out of the jurisdiction, or unable to testify, given in a former action between the same parties, relating to the same matter; . . . " Counsel for respondents testified as to his efforts to produce this witness, who was ill, to testify in his case. Objection was made because of the inadequacy of the showing but the court ruled that the showing was sufficient. With respect to the objection that the parties were not the same, we are satisfied that the objection was good and the ruling to the contrary was erroneous.

In the first action Lorraine Smith, a minor, sued by a guardian *ad litem* for her personal injuries sustained in this accident. She was suing purely in her own right, and, as already observed, this court, in passing upon that appeal, held that where "the infant is not an active participant in the accident, but was merely passively present, the negligence of the father in the operation of the car cannot be imputed to the infant". (*Smith* v. *Schwartz, supra,* p. 166.) In the present case the three daughters invoke the statutory remedy provided by section 377, Code of Civil Procedure, and sue as heirs of their deceased father. Legally they stand in his shoes, and had he been guilty of contributory negligence, such negligence would bar their recovery, as it would have barred his. The evidence in the last trial was confined almost entirely to the question of contributory negligence. It is obvious that had this case been tried first, and the Lorraine Smith case later, the evidence here could not have been read in her later case, for reasons already stated. The rule, of course, must work both ways. It is true that the California cases hold that section 1870, subdivision 8, should receive a liberal construction, but no case has been cited, and we have found none, where it has been held that the parties are the

same where one action is brought for one individual's personal injuries and the other is brought by three individuals (of whom the first plaintiff happens to be one) suing upon the purely statutory right granted by section 377, Code of Civil Procedure, as heirs, for the death of their ancestor, where in the former case contributory negligence could not be, and was not, in issue, and in the latter it was. Conceding that the admission of Mrs. Holzwarth's testimony was error because of lack of identity of parties, and conceding that there was no sufficient foundation on the other ground, i. e., that her illness was not sufficiently shown—still there was no reversible error for the following reasons: Mrs. Holzwarth's testimony at the 1934 trial was addressed almost entirely to the speed of the Buick and that factor has been by appellant's concessions, eliminated from the present case. Her testimony showed that she was sitting beside her husband in his automobile, traveling southerly, following the Buick, and saw the collision at a distance of about 250 or 300 feet; that she saw the machines collide and "saw the Studebaker going up in the air, that is all I saw"; that the collision "was on the dirt and on the pavement" on her right; that she identified the Buick because as she had seen it up the road she had noticed Indian blankets piled high in the back of it; that the last time the Buick had passed her car it was "about 500 feet" (presumably northerly of the intersection). She testified that her husband drives no faster than thirty or forty miles an hour and that the Buick, when it passed them, was traveling "fifty-five or sixty miles". On direct examination she was asked whether after the collision she had made any observations as to where the cars were, or whether there was a side street, and answered that she paid no attention as she was giving all her attention to the injured child. In response to a question whether the Studebaker was opposite another street she answered in the negative, and when asked whether she knew where Winchester Drive is she answered that she did not. The only questions she was asked on cross-examination were with respect to the Indian blankets in the Buick, with respect to the place where the injured child was when they were extricating her from the wreck, and lastly, the question "As you just testified, you did not notice any side street", which she answered "No". Her testimony with respect to the dirt, simply placed the wrecked Studebaker on

the westerly edge of the paved highway, as other witnesses had done, but had no significance as to its location with relation to Winchester Drive—as to how far south of the intersection the Studebaker might have been. She did not even notice Winchester Drive, so, manifestly, could not have given testimony as other witnesses had, from which the jury could have deduced where the collision had taken place based upon the collocation of physical objects afterward. *She was not cross-examined at all with respect to the speed of the Buick,* nor with respect to what she had observed of the impact itself. Her testimony with respect to speed was purely cumulative. Mrs. Kassner had testified for the respondents that her attention had been attracted to the appellant's Buick by its speed as it passed Morrell Avenue, which she judged to be fifty-five miles an hour and that she kept her eyes upon it and it did not slacken its speed. Respondents' witness Hazeltine estimated the Buick's speed "as around between fifty, fifty-five or fifty-eight miles an hour" and that it did not decrease. Both were disinterested witnesses. The appellant's witness Bird could not testify as to the Buick's speed, but did say, "I saw two cars come together, and the car that was going north [Studebaker] seemed to raise right up in the air and turn over." He, too, was a disinterested witness. The appellant's witness Gurley, a disinterested witness, testified that he was following the appellant's Buick down the Bayshore Highway (and, incidentally, narrowly averted crashing into the intersection wreck himself) and judged his own speed at about forty-five miles an hour and said his recollection was that he was gradually overtaking the Buick. He was then read his cross-examination at the first trial as follows: "Mr. Foley: Q. Now, on the speed of the Schwartz car, do you recall telling me last Saturday that for anything you could say positively, the Schwartz' car might have been going as much as forty-eight or forty-nine miles an hour? A. I do. Q. And that was your best judgment at that time? A. Correct." The appellant testified that as he approached Winchester Drive he was traveling approximately forty or forty-two miles an hour in the fast lane. His wife testified that she knew the maximum speed limit to be forty-five miles an hour, and that she was under the impression "we were just below" that. To summarize: there were two disinterested witnesses for respondents, aside from Mrs. Holzwarth, who fixed the Buick's speed

well over the maximum,—one at fifty-five, the other at fifty, fifty-five or fifty-eight miles an hour. And one of appellant's witnesses at *one time* (before the first trial) admitted the Buick's speed might have been forty-eight or forty-nine miles an hour. It must be remembered that this was on a wet pavement. Then there was the evidence of the violence of the crash, with the Studebaker lifted into the air, spun around and thrown on its side, with no conflict at all on that score. In addition to what has been said, certain concessions were made in appellant's briefs which virtually eliminate all questions of speed from the case on this appeal.

In appellant's opening brief counsel say: "The crux of this case, factually, is whether the decedent obeyed this [Vehicle Code provisions respecting left turn] law. Most of the evidence related to where decedent's car was when it turned left" and "Except for inherent incredibility of plaintiffs' witnesses below discussed, the evidence of speed is in conflict. So we must assume, for this discussion, *that defendant's speed was excessive* and that decedent's was lawful." (Emphasis ours.) And in appellant's closing brief: "In our appeal from the judgment in favor of Lorraine Smith in her former action for her personal injuries, upon the ground that the evidence showed as a matter of law that decedent's negligence was the sole proximate cause of the accident, the evidence of plaintiff's witnesses as to the speed of defendant's car was held sufficient to preclude the appellate court. (14 Cal. App. [2d] 165. . . . *We have therefore carefully avoided raising any issue on this appeal that would come within the rule as to conflict of evidence.* On pages 11 and 12 of our opening brief, we started our discussion of the evidence of the case by *admitting that the evidence of speed was in conflict, and therefore the finding of the jury thereon is binding upon this court on the question of defendant's negligence.*" (Emphasis ours.)

In addition to what has been said there is another interesting feature in this case. The witness Walter Bird testified for the appellant at the 1934 trial and passed away before the last trial, and appellant's wife at the time of the last trial was out of the jurisdiction. Appellant offered their testimony under subdivision 8 of section 1870, Code of Civil Procedure, without objection. The testimony of these witnesses was just as vulnerable to an objection that the parties

were different as was the testimony of Linda Holzwarth to which appellant objected. The appellant therefore had the advantage of having this former testimony before the jury although he had objected to similar testimony when offered by his adversary. It may well be that by thus offering this evidence, he waived any error in the admission of the Holzwarth testimony. (10 Cal. Jur., p. 825, sec. 111; 24 Cal. Jur. 777, sec. 59; *Jameson* v. *Tully*, 178 Cal. 380, 384 [173 Pac. 577]; *Estate of Visaxis*, 95 Cal. App. 617, 624, 625 [273 Pac. 165].) But independently of this possible waiver, we are satisfied for the reasons first given, and after a careful examination of all the evidence contained in this record, that the error was not prejudicial and that there should not be a reversal because of it. In our opinion the case comes clearly within the provisions of section 4½ of article VI of the Constitution.

■ With respect to the appellant's claim that there was such misconduct on the part of respondents' counsel in the trial of this case as to require a reversal, it is sufficient to say that from a careful study of the record and the numerous exchanges between counsel which are shown therein we are not convinced by any means. There were provocations and recriminations on both sides and the trial judge was careful to admonish the jury, either on the suggestion of counsel or on his own motion, to disregard the remarks of counsel. In most of these instances no assignment of misconduct was made. In the trial of this case there were more occasions than usual where intemperate language was used and that is not to be encouraged or condoned, but each side indulged in it. Under the circumstances of this particular case it would be extremely unfair to reverse a judgment on this ground where counsel now complaining was himself subject to the same criticism which he now directs at his adversary. In any event, we are of the opinion that the admonitions of the trial court sufficiently safeguarded appellant's rights.

The judgment is affirmed.

Peters, P. J., and Ward, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on December 30, 1939, and an appli-

cation by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 29, 1940.

Carter, J., voted for a hearing.