## UNITED STATES v. CONFORTI.

### No. 10558.

United States Court of Appeals
Seventh Circuit.

Nov. 10, 1952.

Rehearing Denied Jan. 13, 1953.

Joseph E. Green, Chicago, Ill., for appellant on appeal only.

Otto Kerner, Jr., U. S. Atty., Daniel P. Ward, Asst. U. S. Atty., Chicago, Ill., for appellee.

Before DUFFY, LINDLEY and SWAIM, Circuit Judges.

SWAIM, Circuit Judge.

The defendant was charged with possession of counterfeit Federal Reserve Notes, with knowledge that they were counterfeit and with intent to pass them. He waived a jury and the court found him guilty as charged in counts 4 to 12, inclusive, of the

indictment. A ten year sentence on each of these counts was imposed, the sentences to run concurrently.

On this appeal the defendant contends, first, that the court erred in permitting testimony regarding his alleged conversations and meetings with Government informers or decoys without requiring or permitting disclosure of their identity; and, second, that there was error in the scope of the cross-examination of defendant's character witnesses which the court permitted.

The evidence upon which the Government relies tended to show the following facts:

On June 28, 1950, at 7:00 p. m., Agent Elmer Moore of the United States Secret Service Office in Chicago, Illinois, was present when a Government informer or decoy, identified only as No. 54, called a Chicago telephone number, EStebrook 8-6593, which, it was established, was the defendant's telephone number. Agent Moore then heard a conversation between No. 54 and a person whom No. 54 called "Stanley," whose voice Moore identified as that of the defendant, Stanley Conforti. No. 54 inquired whether the defendant could get him "one for tonight," and said, "I got 60 for a thousand tonight." After asking No. 54 if he could "use two" Conforti said, "O. K. I will see you at 9:00 at the same place." No. 54 then said, "Taylor and Loomis," and Conforti said, "Yes," and hung up. That evening at 8:20 p. m. Agent Wilmer K. Deckard of the Secret Service observed the defendant leave his home in a 1949 blue Ford sedan bearing 1950 Illinois license tag No. 779-579. On the same date Agent Moore saw No. 54 and another Government informer, identified in the testimony only as No. 55, in the vicinity of Taylor and Loomis Streets in Chicago, at which time the agent searched them and the automobile they were in and found that they had no counterfeit money. Moore then gave No. 54 $90.00 in genuine currency. At about 9:00 p. m. Sidney K. Franken, Special Assistant Agent in Charge of the Secret Service in Chicago, together with Agent Samuel G. Goldman, saw the defendant get out of a blue Ford sedan bearing 1950 Illinois license No. 779-579 on Taylor Street between Loomis and Bishop Streets in Chicago. They then saw the defendant meet No. 54 and go with him into a narrow passageway where he stayed for a few seconds and then came out and drove away. After the meeting between the defendant and No. 54 Agent Moore received a package of counterfeit currency from No. 54. The counterfeit currency was wrapped in a newspaper which was then delivered to Mr. William J. Sheehan, the examiner of questioned documents and fingerprints, and he testified that he found the defendant's fingerprints on the wrapper.

Substantially the same sequence of events as those above related were repeated on six later occasions, the last being on October 12, 1950. On each occasion Agent Moore observed No. 54 call the defendant's telephone number and he heard the ensuing conversation. In each case essentially the same thing took place as that which occurred upon the initial call, except that sometimes No. 54 would inquire, "How about two for tonight?" to which the defendant would assent; and in each instance the defendant would arrange to meet No. 54 at a certain time in the evening at the same place, the vicinity of Taylor and Loomis Streets. On every occasion the defendant was observed leaving his house, in an automobile of a certain description, prior to the agreed time, by an agent of the Secret Service. In each instance the defendant was seen by another agent or agents arriving in an automobile of a corresponding description, at the appointed time and place where he met No. 54. No. 55 was also there on these occasions, "but he always stayed in the background." Prior to each meeting Agent Moore searched No. 54 and No. 55, found no counterfeit currency in the possession of either, and then gave No. 54 some genuine currency. In most instances the defendant was seen to hand to No. 54 a small newspaper-wrapped package. After each meeting Agent Moore would receive from No. 54 and No. 55 a small newspaper-wrapped package containing counterfeit currency. Upon two out of the seven occasions, the defendant's fingerprints were found to be on the wrapper. On one of these two occasions the fingerprint was

found on the inside of the wrapper, next to the counterfeit currency.

The defendant denied that he had ever possessed any counterfeit currency; he denied the telephone conversations attributed to him; and he denied ever meeting with anyone in the vicinity of Taylor and Loomis Streets for the purpose of delivering counterfeit money.

On this appeal the defendant contends that it was error for the trial court to admit evidence showing defendant's transactions with No. 54 "without requiring the Government or permitting the defendant to identify" No. 54 and No. 55. The defendant contends that their identity was essential to his defense since, if he had been afforded the opportunity to cross-examine those persons or to call them as witnesses, they might have failed to corroborate the Government's case.

We agree that under the circumstances disclosed by the evidence in this case the defendant had a right to demand a disclosure of the indentity of No. 54. We think it would have been error for the trial court to refuse such a demand. The Government insists, and correctly so, that communications made by informers to the Government are privileged. But the unidentified person, No. 54, involved in this case was more than a mere informer. He was not simply an individual who, knowing that the defendant had committed or was about to commit a crime, communicated that knowledge to the authorities so that the police, acting independently, might then procure evidence of the crime. On the contrary, No. 54 played a part with the defendant in the very transactions upon which the Government relies to prove its case.

This distinction between one who plays a part in a criminal transaction and one who is a mere informer is well illustrated in Sorrentino v. United States, 9 Cir., 163 F.2d 627. There the defendant was charged with an illegal sale of opium to a person whom the Government considered a confidential source. The trial court sustained objections to questions asking his identity on the ground that answers to such questions would violate the privilege as to the identity of informers. The Court of Appeals stated that this was error, saying, 163 F.2d at page 628:

"If the person whom Grady called an informer had been an informer and nothing more, appellant would not have been entitled to have his identity disclosed; but the person whom Grady called an informer was something more. He was the person to whom appellant was said to have sold and dispensed the opium described in the indictment. Information as to this person's identity was therefore material to appellant's defense, and appellant was entitled to a disclosure thereof."

The Government urges that in the instant case the indictment charges, not a sale of counterfeit currency, but only its possession; that, assuming a sale could not have been proved without revealing the identity of the informers, the evidence is ample to support the charge of possession; and that this is particularly so in view of the evidence that on two occasions the defendant's fingerprints were found on the paper in which the currency was wrapped.

We cannot agree that in this case the fact that the defendant was charged with possession and not sale of counterfeit currency is decisive. The defendant's possession was proved only by evidence of his transactions with No. 54, evidence indicating that he sold and delivered the counterfeit currency to No. 54. We think the applicable principle was announced in Wilson v. United States, 3 Cir., 59 F.2d 390. That case arose out of a criminal prosecution against the Democratic League of Delaware for the unlawful possession of intoxicating liquor. The League had made a motion in that action to suppress evidence which it alleged had been obtained by an illegal search and seizure. During the hearing on the motion one Harold D. Wilson, the deputy prohibition administrator who had seized the evidence sought to be suppressed, testified that he entered the premises of the League upon the invitation of a member, who had furnished him with a

key. Wilson was asked the name of this member, and after having been directed by the court to answer, he refused to do so. He was adjudged to be in contempt and was committed.

The Court of Appeals, in considering whether the name of the member alleged to have supplied the key was properly withheld, discussed with approval the well established doctrine that communications made by informers to the Government are privileged. The Court then stated in 59 F.2d at page 392:

"There is, however, an exception to this rule or a modification of this general doctrine, in that it gives way to another doctrine of the law when the two conflict. A trial court must dispose of the cause before it. If what is asked is useful evidence to vindicate the innocence of the accused or lessen the risk of false testimony or is essential to the proper disposition of the case, disclosure will be compelled."

In that case the question whether a member had in fact so furnished the witness with access to the premises was determinative of the question of whether there had been an illegal search and seizure. Therefore, his indentity was "essential to the proper disposition of the case," and could not be withheld when demanded. See also United States v. Coplon, 2 Cir., 185 F.2d 629, 638–9; United States v. Andolschek, 2 Cir., 142 F.2d 503, 506.

In the case at bar the Government relies upon the evidence of defendant's conversations and meetings with the unidentified Government informers or decoys to prove that he possessed counterfeit currency. The defendant denies that he engaged in such transactions. If in fact he did not deliver counterfeit currency to these unidentified persons pursuant to the alleged conversations, the charge of possession is not proved. The role which these persons are alleged to have played made them logical choices as witnesses to test the credibility of the Government's testimony. Consequently, the defendant was entitled to inquire and to be answered as to their identity,

However, while we agree that the defendant was entitled to be given the identity of No. 54 in an answer to a proper inquiry by him, a search of the record fails to show that any demand was made by the defendant for an answer which would furnish such knowledge.

 In the examination of Secret Service Agent Moore he was asked, with reference to No. 54, "Is that person considered a confidential source of the United States Secret Service?" Over the objection of the defendant, the witness was permitted to answer, "He is." No grounds for the objection were stated. Later in the examination, in answer to a question as to the sex of No. 54, the witness answered: "54 is a man." When Moore was asked: "Was he employed by the Secret Service at that time?" counsel for the Government objected on the ground that an answer "would be a violation of the confidential relation between the Secret Service and the subject and possibly * * * it may place him in jeopardy * * *." This was the only objection on this ground to any question. The Court overruled the objection and the witness answered that he did not know. When asked whether No. 54 was still alive, Moore again said he did not know. To the question, "Is he still employed by the Government, do you know?" the court sustained an objection on the ground that there had been no testimony that 54 was employed by the Government. An objection to a question as to the last time the witness had seen 54 was sustained on the ground that the question was irrelevant. In answer to further questions by counsel for the defendant the witness answered that he did not know whether 54 and 55 were agents or were in the employ of the Secret Service but that so far as he knew they were not. The court then sustained objections to two questions as "being irrelevant and immaterial" which asked Moore if he knew whether or not 54 had "any occupation or vocation" and if he (Moore) ever did "any work with No. 54 prior to this time."

The above gives all of the questions which were asked by counsel for the defendant on this subject. The witness was

never asked the name of No. 54 nor where No. 54 lived. As we pointed out above, the only objection made by the Government on the ground that an answer would be a violation of the confidential relation between the Secret Service and No. 54 was overruled. From this record we must presume that had counsel for the defendant asked the witness Moore the name of No. 54, or where he lived, or any other question pertinent to 54's identity, the trial court would have required the witness to answer. The Government was under no duty to volunteer the names of all possible witnesses, nor was it required to bring into court as witnesses all persons who participated in or had some knowledge of the transactions here involved. The failure to bring in witnesses who would naturally be assumed to be friendly to the Government might justify an inference that such witnesses would testify against the Government but the evidence in this case was sufficient to overcome any such inference and to justify the decision of the trial court that:

> "The evidence is clear that this man was a big operator, and a wholesaler, and the number of transactions and business that he did with Operator 54 would indicate, and I think the Court could reasonably infer from the evidence that these were not the only sales he was making. He had access to a lot of money and was probably associated with a counterfeiting ring."

The failure of the defendant to inquire as to the identity of No. 54 would seem to justify the Government's contention that the defendant actually knew 54's identity all of the time and did not want him to testify. Further indication that the defendant knew and had had prior transactions in counterfeit currency with No. 54 is the fact that on the first of the seven telephone calls proved in this case the defendant apparently recognized the voice of No. 54 since defendant agreed to deliver the counterfeit currency without being told or asking for the identity of No. 54. Both understood the strange language they used in making the deal. The defendant in that conversation said he would meet No. 54 at the *same place*. Both understood the *same place* to mean "Taylor and Loomis."

The evidence shows that on one of the trips to deliver counterfeit currency to No. 54 the defendant was accompanied by his wife. Yet the defendant failed to call his wife as a witness to deny that they made that trip. From the failure of the defendant to call his wife as a witness the trial court could infer that if called she would have testified that the trip was made as described by the Government witnesses.

■ This court, of course, cannot reverse a judgment of the District Court on the theory that the District Court might have erred if it had been required to rule on an objection to a question which sought to establish the identity of No. 54 or No. 55.

■■ The defendant further complains that the trial court allowed improper cross-examination of his character witnesses. Each of the three character witnesses stated on direct examination that the defendant's reputation for truth and veracity and as a law abiding citizen was good. On cross-examination these witnesses were questioned concerning previous arrests of the defendant by the Chicago Police Department. The defendant contends that the court erred in permitting these inquiries on cross-examination without first ascertaining that there had in fact been such arrests and that they were for crimes involving some measure of moral turpitude.

Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168, the only case cited by the defendant in support of this contention, does not require the trial judge, at least in a trial to the court, to limit cross-examination of character witnesses to inquiries about former arrests or crimes which have first been shown to the judge to have actually occurred. Nor does it limit such inquiries to only those crimes involving moral turpitude. A man's reputation for truth and veracity and as a law abiding citizen could, of course, be ruined in a community without his ever having been charged with or convicted of a serious crime. The Supreme Court in that case, which was tried to a jury, approved

the method there followed by the trial judge who asked, out of the hearing of the jury, if the event inquired about of the character witness had actually occurred. Such a method would, of course, prevent possible prejudice from a recital of events in a hypothetical question or of a recital of events which never actually occurred. In a trial to the court such a method would serve no useful purpose.

In the Michelson case the Supreme Court, in discussing the proper scope of the cross-examination of a character witness said, 335 U.S. at page 479, 69 S.Ct. at page 220:

"The price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him. The prosecution may pursue the inquiry with contradictory witnesses to show that damaging rumors, whether or not well-grounded, were afloat—for it is not the man that he is, but the name that he has which is put in issue. Another hazard is that his own witness is subject to cross-examination as to the contents and extent of the hearsay on which he bases his conclusions, and he may be required to disclose rumors and reports that are current even if they do not affect his own conclusion. It may test the sufficiency of his knowledge by asking what stories were circulating concerning events, such as one's arrest, about which people normally comment and speculate. Thus, while the law gives defendant the option to show as a fact that his reputation reflects a life and habit incompatible with commission of the offense charged, it subjects his proof to tests of credibility designed to prevent him from profiting by a mere parade of partisans."

In the Michelson case the Supreme Court also pointed out that the courts of last resort have tried to overcome the danger that the true issues might be obscured and confused by leaving it to the discretion of the trial court to limit the number of such witnesses and to control cross-examination. The court said, 335 U.S. at page 480, 69 S.Ct. at page 221:

"Both propriety and abuse of hearsay reputation testimony, on both sides, depend on numerous and subtle considerations, difficult to detect or appraise from a cold record, and therefore rarely and only on clear showing of prejudicial abuse of discretion will Courts of Appeals disturb rulings of trial courts on this subject."

This court has twice held that the scope of cross-examination in general is largely a matter for the discretion of the trial court, the action of which should not be disturbed in the absence of clear showing of abuse of the discretion. United States v. Lawinski, 7 Cir., 195 F.2d 1; Jelke v. United States, 7 Cir., 255 F. 264, 288. The appellant has shown no such abuse of discretion by the trial court in the instant case as would justify a reversal of the judgment.

The judgment is

Affirmed.