[Crim. No. 5689. Second Dist., Div. Three. Mar. 29, 1957.]

THE PEOPLE, Respondent, v. JUAN T. ALANIZ, Appellant.

Louis Romero for Appellant.

Edmund G. Brown, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

WOOD (Parker), J.—Defendant was charged with violation of section 11500 of the Health and Safety Code in that he unlawfully had heroin in his possession. He admitted

allegations of the information that he had been convicted of two felonies (violations of said § 11500). In a jury trial, he was convicted. He appeals from the judgment and the order denying his motion for a new trial.

 Appellant contends that there was no probable cause for the arrest, and that the subsequent search and seizure were unlawful.

Officer Smith testified that on January 20, 1956, about 7:55 p. m., he saw an automobile stop in front of 24102 Fries Avenue in Wilmington; at that time he and Officer DeLeon were in an automobile near that address, and he (Officer Smith) drove their automobile to the automobile which had stopped; Officer DeLeon got out of their automobile and went to the driver's side of the other automobile; Officer Smith also got out of the automobile, which he had been driving, and went to the driver's side of the other automobile, arriving there about 15 or 20 seconds after Officer DeLeon arrived there; defendant was in the driver's seat of the other automobile; two boys, whose ages were 14 and 11 were also in the other automobile. Officer Smith testified further that he arrested the defendant; and that Officer DeLeon arrested the defendant.

After the above testimony had been given, counsel for defendant requested the court to hear evidence out of the presence of the jury with respect to probable cause for the arrest. Thereupon, out of the presence of the jury, Officer Smith testified that about 10 days before the arrest an informer (referred to herein as informer A) gave him information as to a location where narcotics were being distributed; the information included directions regarding streets to travel in order to get to the location—no address was given; he had known the informer more than a year, and information he had previously received from him had been reliable. He testified further that on January 19 another informer (referred to as informer B) stated that narcotics were being dispensed ''from this location'' (the same location given by informer A), that the car was described as a 2-door black Chevrolet which was ''lowered in the back,'' that the fellow was described as a Mexican with a mustache, and his name was Johnny; he (officer) had known the informer more than a year, and information which he had previously received from him had been reliable. He testified further than on January 20, about 6 p. m., another informer (referred to as C) called him by telephone and gave him ''the block where

the house was located and stated it was about in the center of the block''; the informer also said that two persons were involved and the name of one of them was Zacci, and the car was a 1950 black Chevrolet; he (officer) knew the informer, recognized his voice by telephone, and had previously received reliable information from him. He testified further than on January 20, about 6:30 p. m., another informer (referred to as D) told him and Officer DeLeon that narcotics were being dispensed ''from this place,'' that he knew the exact house, and that the car involved was a black Chevrolet; he (officer) had known the informer more than a year.

Officer Smith testified further than on January 20, about 1 p. m., he went by the location, concerning which he had previously received information, and he saw a black Chevrolet in front of the house. He testified further that on January 20, just prior to the arrest, he saw a Chevrolet, which he had previously seen in front of the house, make a U-turn and park in front of the house; the man who was driving the Chevrolet fitted the description that had been given previously; the officers went to the Chevrolet within a few seconds after it stopped; the man therein said that his name was Johnny; he (officer) turned his flashlight on the man's arm and noticed that he had numerous scab formations over a vein, and some of them appeared to be fresh; in response to questions, the man said that he was not a user but he had been; he (officer) turned the flashlight into the car, through the open door, and observed a bindle on the floor board, which bindle appeared to be a bindle of heroin; the conversation with defendant might have taken 15 or 20 seconds; Officer Smith asked Officer DeLeon if he had defendant under arrest, and Officer DeLeon said ''Yes,'' and Officer Smith said, ''If you haven't he's under arrest now.'' He also testified that information given by the informers was confidential and that the public interest would suffer if he were to give the names of the informers.

Also, out of the presence of the jury, Officer DeLeon testified that on January 20, about 6:30 p. m., he had a conversation with informer D, whom he had known about three years; after that conversation he and that informer went to the vicinity of 24102 Fries Avenue, and the informer pointed out the house at that address as the place where he had purchased narcotics; he also pointed out a 1949 black Chevrolet automobile which was then in front of the house; the informer

went to the house, stayed about 10 minutes, and upon returning stated that narcotics were in the automobile which was then in front of the house; he (officer) communicated said information to Officer Smith; after the arrest of defendant, Officer DeLeon (witness) searched the house, with the permission of Mrs. Jiminez, who lived in the house; he found a needle, spoon, dropper and wet cotton, which were wrapped together and were in a linen cabinet in the bathroom; the son of Mrs. Jiminez was known as Zacci.

Also, out of the presence of the jury, Mrs. Jiminez testified that she lived at 24102 Fries Avenue; her son Zacci lived there also; on January 20, 1956, when there was a knock on the door, she told a girl to open the door; the person at the door said he was a police officer and he had to search her house; she told him that it was all right; defendant had been in her bathroom on that day.

The court ruled to the effect that there was probable cause for the arrest and search.

Thereupon, the trial proceeded in the presence of the jury.

Officer Smith testified further, repeating the testimony he had given (out of the presence of the jury) regarding: the marks on defendant's arm; the statement of defendant that he had been a user; and the bindle which was on the floor board. He testified further that it had been raining prior to and soon after the arrest; that he found two packages on the ground near the Chevrolet; those packages were dry.

Officer DeLeon testified that he participated in the arrest of defendant in front of 24102 Fries Avenue; he saw a small bindle on the floor of the Chevrolet, and he saw Officer Smith pick it up; he (witness) also saw two bindles in the street by the side of the Chevrolet, and he saw Officer Smith pick them up; he (witness) went into the house at said address and found the needle, spoon, dropper and cotton (Exhibit 3) in a linen cabinet in the bathroom; in response to questions, defendant said the "outfit" (Exhibit 3) was his, that he had put it in the house that morning (January 20), and he was using one and one-half "caps" of heroin a day.

The three bindles or packages contained heroin.

Mrs. Jiminez, called as a witness by defendant, testified that her son Seferino, who is known as Zacci, lived at her house (24102 Fries Avenue) and he was there on said January 20; Juan or Johnny, the defendant, was at her house on January 20 and he went into the bathroom; he had taken

Henry and Richard Medina, her grandchildren, for a ride. (They were in the Chevrolet when defendant was arrested.)

Concha Medina, called as a witness by defendant, testified that she is the mother of the boys Henry and Richard, and she is the daughter of Mrs. Jiminez; on January 20 defendant had been at her house working on her automobile; about 7:20 p.m. of that day, defendant came to her house to take Henry to his grandmother Mrs. Jiminez, and to take Richard to his other grandmother.

Defendant testified that he owned the Chevrolet involved here; about 1:30 p.m. on the day of the arrest he drove a truck to Mrs. Jiminez's house; he had left his Chevrolet there the night previously, and he had gone in the truck to his home; soon after he arrived at Mrs. Jiminez's house, he and Zacci went in the Chevrolet to Concha Medina's house, where he (defendant) repaired her automobile; he and Zacci left her place about 6 p.m. and returned to Mrs. Jiminez's house, arriving there about 6:15 p.m.; he (defendant) went into the bathroom at that house and washed oil off his hands; he was in the house about 15 minutes and during that time Zacci used the Chevrolet; when Zacci returned the Chevrolet, defendant drove it to Concha's house, got the two boys, and drove back to the place in front of Mrs. Jiminez's house where he was arrested; he did not know that a bindle was in the automobile or that the two packages were on the street; the first time he saw the bindles was when the officers called his attention to them; he did not know what was in the bindles; he told the officers that the bindles were not his; he did not take the spoon and "outfit" (Exhibit 3) into the house; he told Officer DeLeon that those things (Exhibit 3) were not his (defendant's); during the evening there had been intermittent light showers or drizzles, but at the time of the arrest the street was dry; the bindles which the officers found on the street were dry, and the street was also dry; there were scars on his (defendant's) arm which were caused by punctures when he used heroin years ago.

Officer DeLeon, who had testified that he participated in the arrest, was called as a witness by defendant and he was asked: "Officer DeLeon, about how soon after the defendant stopped the car in front of Mrs. Jiminez's place did you effect the arrest?" He answered: "I would say almost immediately."

Zacci, called as a witness by defendant, testified that he

did not use the Chevrolet about 6:30 p. m on the day of the arrest, to go to the store.

Appellant contends, as above stated, that the arresting officers did not have probable cause for arresting him. He argues that the information given by the informers was not sufficient to constitute probable cause. In *Trowbridge* v. *Superior Court*, 144 Cal.App.2d 13 [300 P.2d 222], the arrest was made upon information furnished by an informer, whom the arresting officer knew and who had supplied the officer with reliable information on two or three occasions. It was held in that case (p. 17) that the arrest was lawful. "A valid arrest may be made solely by reason of information communicated by a reliable informant." *People* v. *Montes*, 146 Cal.App.2d 530, 532 [303 P.2d 1064]; *People* v. *Penson*, 148 Cal.App.2d 537, 539 [307 P.2d 24].) In *People* v. *Boyles*, 45 Cal.2d 652 [290 P.2d 535] at page 656, it was said that it is settled "that reasonable cause to justify an arrest may consist of information obtained from others and is not limited to evidence that would be admissible at the trial on the issue of guilt." In the present case there were four informers, whom the arresting officers knew and who had previously supplied the officers with reliable information. The evidence was sufficient to show probable cause for the arrest. Also, the subsequent search of defendant and the seizure of the bindles were lawful.

Appellant also contends that the search of the house by Officer DeLeon was unlawful. The officers had information from the informers to the effect that narcotics were being distributed from the house. The officers had just arrested a person in front of the house and had found bindles which apparently contained heroin; and the person arrested appeared to fit the description of a person referred to, by one of the informers, as a person who dispensed narcotics from that location; and the person arrested appeared to be a user of narcotics. When the officer knocked on the door of the house, the door was opened. When the officer identified himself and said that he had to search the house, the lady who lived there told him that it was all right. The evidence was legally sufficient to prove that the search of the house was not unlawful.

Appellant contends further that the trial court abused its discretion in denying his motion that the witnesses, except the one testifying, be excluded from the courtroom. Such a motion is within the discretion of the trial court.

(*People* v. *Boyden,* 116 Cal.App.2d 278, 283 [253 P.2d 773].) Apparently the motion pertained principally to the two police officers. When the motion was made, the deputy district attorney said that the two officers had testified at the preliminary hearing. It does not appear that there was an abuse of discretion.

Appellant also contends that he was denied due process of law because the trial court did not require the police officers to disclose the identity of the informers. Section 1881, subdivision 5, of the Code of Civil Procedure provides: "A public officer can not be examined as to communications made to him in official confidence, when the public interest would suffer by the disclosure." Officer Smith testified that the information given by the informers was confidential and the public interest would suffer if the names of the informers were disclosed. In *People* v. *Gonzales,* 141 Cal.App. 2d 604 [297 P.2d 50], it was held (pp. 607-608) that, under the circumstances therein, the court did not err in refusing to allow the defendant to cross-examine the police officers as to the name of their informant. It was said in that case at page 608: "The officer's information must have come from a *reliable* source and the officer must act in good faith in testifying that he had received his information from a reliable person, and such good faith must pass the scrutiny of the trial judge. No abuse of discretion having been shown, the court's ruling was correct." In the present case, the court did not err in sustaining objections to questions as to the identity of the informers.

The judgment, and the order denying the motion for a new trial, are affirmed.

SHINN, P. J.—I concur in the judgment. As I read the record the officers arrested the defendant before they discovered any objects in his car or observed any scars on his arms. They acted upon the information they had received from informers, plus their own observations of defendant's actions as related to his surroundings. It is my opinion that neither the information received by the officers nor their observations of defendant's conduct, standing alone, would have furnished reasonable cause for the arrest.

Whatever may be our opinion of the character of informers in general and their reliability, we must realize that they have a necessary part in the fight against the traffic in narcotics. Scores of cases with which we are familiar establish

this fact. I do not imply that all informers are venal. I do not doubt that there are unwilling addicts and former addicts who believe they have a duty to join in the fight against criminal and vicious activities that have assumed alarming proportions. But I do not believe that even those who are completely blind to the evils of illegal and dishonorable methods of law enforcement would go so far as to say that one citizen can cause the arrest of another by merely pointing a finger at him and calling him a law breaker. Accusations coming from an informer should be regarded as merely a starting point of an investigation. If the investigation does not develop facts which furnish substantial corroboration of the statements of the informers there is no reasonable cause for an arrest. There can be no formula for determining the sufficiency of the corroborative circumstances. Purveyors of narcotics are cunning. They have "ways that are dark and tricks that are vain." Conduct of those under suspicion of handling narcotics may be of major significance to a trained officer although in any other connection it would not even arouse suspicion. It is within the discretion of the trial court, in a hearing properly conducted in the absence of the jury, to determine whether the information, and the relevant corroborating circumstances justify the presentation to the jury of the entire evidence concerning the arrest and the discovery of contraband. I do not doubt that the evidence in the present case established the legality of the arrest. The observations of the officers as to the location of the house, the identity of Zacci and Johnnie (defendant is named Juan), the car described by the informants in which defendant was seated, the fact that one informant shortly before the arrest entered the house and came back stating that he had learned that the narcotics were in plain sight on the front seat of the car and that there were "a hell of a lot of them," the parking of the car in front of the house on separate occasions, and the fact that defendant answered the description of one of the men, furnished sufficient verification of the information the officers had previously received. The house under surveillance was the one described by the informers and it turned out to be the right house.

In the absence of the incriminating information there would have been no reason whatever for the surveillance or the arrest.

I agree with Mr. Justice Vallée that when the People make use of the statements of informers as proof of reason-

able grounds for an arrest they waive the right to conceal from the court and the accused the name or names of the informers, but it does not follow that in every case the court must compel the disclosure of the names if the defendant demands it. It is a matter for the court, and not the prosecutor or the witness to decide. If concealment is unfair to the defendant—if nondisclosure would probably hamper his defense or if disclosure might furnish relevant evidence not otherwise available, concealment ought not to be permitted. Doubts should be resolved in favor of the defendant. He should not suffer from the court's mistakes.

In *Roviaro* v. *United States*, 353 U.S. 53 [77 S.Ct. 623, 1 L.Ed.2d 639], quoted by Mr. Justice Vallée, the court, through Mr. Justice Burton, spoke as follows: "We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors. . . .

"This is a case where the Government's informer was the sole participant, together with the accused, in the transaction charged. The informer was the only witness in a position to amplify or contradict the testimony of government witnesses. Moreover, a Government witness testified that Doe denied knowing petitioner or ever having seen him before. We conclude that, under these circumstances, the trial court committed prejudicial error in permitting the Government to withhold the identity of its undercover employee in the face of repeated demands by the accused for his disclosure."

I cannot see that permitting concealment of the names of the informers was an abuse of discretion or that it resulted in any prejudice to the defendant. If the informers had been called as witnesses their testimony would not have tended to establish any affirmative defense. At most, defendant could have hoped that they would deny having given any information to the officers. But when the entire evidence was before the court and it was established that the conditions observed by the officers corresponded with the facts stated by the informants there would have remained no rea-

son to believe that the officers had not been given the information. In the fight against the narcotic traffic there are clear advantages in encouraging the cooperation of addicts and others in the detection of criminal activities. Much of this would be lost if information could not be given in confidence. The names of informers need not be disclosed when there is no reason to believe that concealment would be unfair to the defendant because disclosures might in some manner strengthen his defense.

The court did not abuse its discretion in preserving the anonymity of the informers and defendant suffered no prejudice.

VALLÉE, J.—I dissent. The evidence is without conflict that the arrest was made solely on information received from one or more so-called informers. The attorney general so conceded at the argument. As I read the prevailing opinion, it holds that an arrest may be made solely on such information. Until the Supreme Court in unequivocal language says it is the law that information given by one or more informers is sufficient in itself to constitute probable cause for a police officer to believe a person has committed a felony and thus justify the arrest of that person, I cannot concur in such a holding. The Supreme Court has not done so. The Supreme Court of the United States characterizes the use of informers as "dirty business." (*On Lee* v. *United States,* 343 U.S. 747 [72 S.Ct. 967, 96 L.Ed. 1270, 1277].) They are persons who give information to the police with the expectation of receiving consideration of one sort or another therefor. Such characters are more frequently and more appropriately referred to as "stool pigeons" and "stoolies."

The arrest, and consequently the search, was made in violation of defendant's constitutional rights. Despite my utmost abhorrence and detestation of narcotics peddlers, I cannot give sanction to a prosecution for crime which involves commission of another crime. Unless two wrongs make a right, prosecutions and convictions which can only be obtained by graver violations of law should not be countenanced by any consideration of sound public policy. I reject the odious doctrine that the end justifies reprehensible means.

As I read the cases the majority view is that information received from an informer is insufficient in itself to constitute probable cause for an arrest. In *People* v. *Moore,* 141 Cal.App.2d 87 [296 P.2d 91], this court stated (p. 89):

"Information provided by an anonymous informer is relevant on the issue of reasonable cause, but in the absence of some pressing emergency an arrest may not be based solely on such information. (*Willson* v. *Superior Court,* 46 Cal.2d 291, 294 [294 P.2d 36].)"

There is no evidence in the record of a pressing emergency or of any emergency. The officers testified there was nothing suspicious or out of the ordinary in defendant's driving of the automobile or in his conduct.

In *United States* v. *Kind,* (2 Cir.) 87 F.2d 315, a case in which an arrest and search was made on information received from an anonymous informer, the court stated (p. 316):

"The information received from the unnamed and unknown person was not sufficient to show that the crime charged was committed. A motion made to suppress this evidence was denied previous to the trial. It was renewed at the trial and denied. The search and seizure was clearly a violation of the Fourth Amendment (U. S. Constitution). [Citations.] And the evidence obtained thereby was improperly received."

In *United States* v. *Lee,* (2 Cir.) 83 F.2d 195, a prosecution for smoking opium, it is stated (p. 196):

"Nor was there probable cause to believe that an offense was being committed in the presence of the officers so that an arrest could be lawfully made without a warrant. According to the affidavit and testimony of the government agents, they proceeded first upon advice of an informer and upon the smell of the opium at a crack in the door. The first was inadequate to secure a warrant." (To the same effect, *Contee* v. *United States,* (U.S.App. D.C.) 215 F.2d 324, 326-327; *Worthington* v. *United States,* (6 Cir.) 166 F.2d 557, 565-566; *United States* v. *Baldocci,* 42 F.2d 567; *United States* v. *Tom Yu,* 1 F.Supp. 357, 360; *United States* v. *Castle,* 138 F.Supp. 436, 439; *Smallwood* v. *Commonwealth,* 305 Ky. 520 [204 S.W.2d 945, 947]; *State* v. *Zupan,* 155 Wash. 80 [283 P. 671, 674]; *People* v. *Guertins,* 224 Mich. 8 [194 N.W. 561, 562]; *Eldredge* v. *Mitchell,* 214 Mass. 480 [102 N.E. 69]; *Merwin* v. *State,* —— Okla.Crim. —— [277 P.2d 208, 211]; *State* v. *Arregui,* 44 Idaho 43 [254 P. 788, 793-794, 52 A.L.R. 463].)

Reasonable cause justifying an arrest must exist at the time of the arrest. (*People* v. *Brown,* 45 Cal.2d 640 [290 P.2d 528].) An arrest cannot be justified by what a search, which follows, produces. (*People* v. *Gale,* 46 Cal.2d 253,

255-256 [294 P.2d 13].) And a search, whether incidental to an arrest or not, cannot be justified by what it turns up. (*People* v. *Brown, supra,* 643.)

I am further of the opinion the court erred in sustaining objections of the prosecution to questions directed to the police officers seeking the identity of the informers. "Since the protection against privileged communications often leads to a suppression of the truth and to a defeat of justice, the tendency of the courts is toward a strict construction of such statutes." (*Samish* v. *Superior Court,* 28 Cal.App.2d 685, 695 [83 P.2d 305].)

The Supreme Court of the United States, holding that it was prejudicial error to sustain objections of the prosecution to questions directed to federal narcotic agents seeking the identity of an informer in *Roviaro* v. *United States,* 353 U.S. 53 [77 S.Ct. 623, 1 L.Ed.2d 639] (decided March 25, 1957) stated:[1]

"Petitioner contends that the trial court erred in upholding the right of the Government to withhold the identity of John Doe. He argues that Doe was an active participant in the illegal activity charged and that, therefore, the Government could not withhold his identity, his whereabouts, and whether he was alive or dead at the time of trial. The Government does not defend the nondisclosure of Doe's identity with respect to Count 1, which charged a sale of heroin to John Doe, but it attempts to sustain the judgment on the basis of the conviction on Count 2, charging illegal transportation of narcotics. It argues that the conviction on Count 2 may properly be upheld since the identity of the informer, in the circumstances of this case, has no real bearing on that charge and is therefore privileged.

"What is usually referred to as the informer's privilege is in reality the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law. *Scher* v. *United States,* 305 U.S. 251, 254 [59 S.Ct. 174, 83 L.Ed. 151] ; *In re Quarles and Butler,* 158 U.S. 532 [15 S.Ct. 959, 39 L.Ed. 1080] ; *Vogel* v. *Gruaz,* 110 U.S. 311, 316 [4 S.Ct. 12, 28 L.Ed. 158]. The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of

---

[1]The United States Law Week, vol. 25, No. 37, March 26, 1957.

the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation.

"The scope of the privilege is limited by its underlying purpose. Thus, where the disclosure of the contents of a communication will not tend to reveal the identity of an informer, the contents are not privileged. Likewise, once the identity of the informer has been disclosed to those who would have cause to resent the communication, the privilege is no longer applicable.

"A further limitation on the applicability of the privilege arises from the fundamental requirements of fairness. Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way. In these situations the trial court may require disclosure and, if the Government withholds the information, dismiss the action. Most of the federal cases involving this limitation on the scope of the informer's privilege have arisen where the legality of a search without a warrant is in issue and the communications of an informer are claimed to establish probable cause. In these cases the Government has been required to disclose the identity of the informant unless there was sufficient evidence apart from his confidential communication.

"Three recent cases in the Courts of Appeals have involved the identical problem raised here—the Government's right to withhold the identity of an informer who helped to set up the commission of the crime and who was present at its occurrence. *Portomene* v. *United States,* 221 F.2d 582; *United States* v. *Conforti,* 200 F.2d 365; *Sorrentino* v. *United States,* 163 F.2d 627. In each case it was stated that the identity of such an informer must be disclosed whenever the informer's testimony may be relevant and helpful to the accused's defense.

. . . . . . . . . . . . .

"The fact that petitioner here was faced with the burden of explaining or justifying his alleged possession of the heroin emphasizes his vital need for access to any material witness. Otherwise, the burden of going forward might become unduly heavy."

In *United States* v. *Blich,* 45 F.2d 627, the court reasoned (p. 629):

"We then come to discuss that feature of the case which

involves the refusal of the officer to give the name of his informant. Counsel have cited no cases upon the exact point, although there is language in the case of *United States* v. *Allen,* (D.C.) [16 F.2d 320, and *Emite* v. *United States,* (C.C.A.) 15 F.2d 623, which would indicate that such an element might enter into the consideration of the court in the determination of whether or not a probable cause existed. . . . The only question here is as to whether or not, when the matter is presented to a court for the purpose of seeking a determination of whether, under all the circumstances, there was probable cause, this element of those circumstances may remain undisclosed. It is scarcely an answer to the proposition that an agent testifies that his informant was a reliable person, and that he believed the information so given, unless the court sitting in judgment may have the right to determine whether, under all the circumstances, such information was reliable and the agent was justified in having such belief. A belief must or should rest upon a substantial basis. It is not a question of impugning the motives or doubting the honest belief of the agent in regard to the information which he may have received. It is simply requiring the witness to sustain his motives and his beliefs by all the evidence at his command. It is conceivable that a prohibition agent in the earnestness and eagerness of performing his duty might adopt very shadowy leads. But what is of greater consequence is that an ill-intentioned person might give an officer information which would in many instances lead to humiliation and vexation of the innocent automobile driver upon the public highway, and yet, with the failure to disclose the name of his informant, the prohibition agent would be safely ensconced behind his blanket testimony that he was informed by a reliable person. . . .

"I will not go so far as to say that the testimony of the informer upon a hearing of this kind must be presented to establish the probable cause, but I am of the opinion that the only safe rule to adopt will be to require officers who presume to make search and seizures of automobiles on the public highway, without warrant, to disclose every element which goes to make up their case of probable cause, and that this rule reasonably includes the source of their information, so that the court may determine whether or not under all the circumstances a case of probable cause has been established, and perhaps as well to restrict informers to a sincerity of purpose."

In *Smith* v. *State,* 169 Tenn. 633 [90 S.W.2d 523], the court stated (90 S.W.2d 524):

"So we think, when an officer seeks to justify an arrest upon 'a charge made upon reasonable cause,' the officer should be required to reveal the identity of the person making the charge as well as the nature of the charge. The court has to pass upon the officer's justification, and that justification is open to impeachment. A defendant should not be bound by the officer's statement that a charge had been made, and, unless the source of the charge was ascertained, neither its good faith nor reality could well be challenged. An unscrupulous officer, upon a fictitious story of 'a charge made,' might vindicate any arrest, however unlawful, if there could be no further inquiry."

In *Mapp* v. *State,* 148 Miss. 739 [114 So. 825], the court stated (114 So. 826):

"One of the assignments of error is that the court erred in refusing to permit the defendant to ask the witness, and have him answer, from whom he obtained his information. As stated above, the court's ruling was to the effect that the witness would not be required to answer as to who gave him the information that the whisky was to be manufactured at the place described. . . .

"We think the defendant had a right to propound the question to the witness, and have it answered, as to where he obtained the information. This inquiry might have been followed up by others eliciting exactly what was said and the character of the person giving the information; and other pertinent questions showing the nature of the information communicated might also have led to the examination of the informant, who might have contradicted the officer with reference to the information given. The immunity from unreasonable search, seizure, and arrest is one of the most valued liberties afforded and secured by our Bill of Rights under the state and federal Constitutions. And these liberties secured tend to promote peace and order—consequently, the welfare and prosperity of the whole state. While communicating information to officers of the knowledge of a commission of crime by a citizen is commendable, such person making the communication and such officer acting upon it ought to be willing to face the issue resulting from acting upon such information. Where an officer acts without a warrant, he must, under the law, justify his action, and he cannot avoid doing so on the theory that to do so would violate any con-

fidence or confidential communication. The rights of others are involved in such proceedings, and the court should obtain possession of all the information available, standing as nearly as possible in the place of the officer, and judging from the facts which the officer possessed, before it decides the sufficiency of the information to constitute probable cause.''

*Hill* v. *State,* 151 Miss. 518 [118 So. 539], says (118 So. 539) :

''The informant might have been shown to be a notorious liar in that community, or a person of unquestionable integrity. These facts the court must have, in order to determine whether the officer's belief in the truth of the statement was warranted, and in order to allow the defendant an opportunity to show that the statement upon which the officer acted was unworthy of belief and that no probable cause existed for such search.''

*United States* v. *Keown,* 19 F.Supp. 639, cited with approval in *Willson* v. *Superior Court,* 46 Cal.2d 291 [294 P.2d 36], states (p. 645) :

''In the case here under consideration, the officers making the search and arrest knew the reputation of one of the defendants arrested to be that of a dealer in illicit liquor, but did not know where the defendant would be or what kind of car he would be using on the day of the arrest, but for facts furnished him by the informer.

''If the information of the informer was unreliable or he was unworthy of belief, the officer did not have probable cause to make either the search or the arrest. It follows that the court must have all the facts before it can properly determine whether the officer acted on reasonable grounds. If an officer should stop a peaceful, law-abiding citizen on the highway and search his car, subjecting him to humiliation and ridicule, and the offended citizen should seek redress by a suit for damages, surely no court would say the officer would be relieved of responsibility by an answer that he was informed by a reliable person that the citizen was engaged in the illicit liquor traffic, but he could not and would not disclose the name of his informer, thus preventing a fair and impartial investigation of his conduct. The certainty of the law is one of its greatest attributes. We cannot have one law applicable to an identical state of facts for the innocent and another for the guilty. The guilty may sometimes escape under such a rule, but this need not follow if the officer be diligent, and likewise the secrets of state may be kept inviolate. The officer may use the facts furnished by the in-

former as a basis for his own investigation and discover sufficient facts to search or arrest without disclosing the source of his information.

"In the case here, the officers could have pursued the automobile until, from the conduct of the driver or a disclosure of the contents of the car, sufficient facts could have been ascertained to have legally made the search and arrest. Under such a state of facts, it would have been immaterial as to who the informer was, or from what source the officer obtained his information.

"Every accused person has the right to cross-examine on material facts every witness who testifies against him. This has been the rule ever since the law became certain and stabilized, and is a part of due process, which found its expression in the Fifth and Sixth Amendments to the Constitution. See Hale's History of the Common Law, page 145; Starkie on Evidence (2d ed.) vol. 1, page 160.

"When the government calls a witness whose testimony is based in part on that of an informer, it subjects the witness to cross-examination and the informer to whatever peril may arise out of such cross-examination. It is a sound rule to keep secret information furnished to the state of violations of its laws, but this commendable public policy must yield to a higher, or at least an equal, right accorded to an accused to have a court investigate the facts material to his offense in a criminal prosecution, and sometimes the departments of government will be put to a choice of either foregoing a criminal prosecution or disclosing the source of material information necessary to the conduct of orderly judicial procedure."

The Court of Appeals of New York in *People* v. *Ramistella,* 306 N.Y. 379 [118 N.E. 2d 566], stated (118 N.E.2d 568):

"A second error occurred when the Trial Judge prevented cross-examination as to the location of the so-called 'confidential motor number' on the stolen automobile after evidence of that number had been introduced by the People. We are told that the motor number of automobiles is stamped in two places, one in plain view, the other in a secret location known only to car manufacturers, certain representatives of auto theft insurance companies and the police auto squads in the larger cities. The prosecution offered evidence to show that the motor number on the Sims car when it was stolen was 486214163; that on the car sold by Ramistella to the La Perlas the *visible* number, which had been tampered with, read 486220032; and that the number in the secret location

was 486214163—the same as that of Mrs. Sims' registration. This testimony, if believed, rather conclusively established that the car sold by Ramistella to the La Perlas was the stolen car in question. We have no way of knowing what weight the jury gave the other evidence identifying the car.

"The argument of the People that this information must be kept secret in order to protect the public and to aid in the administration of penal justice is not persuasive. Even less compelling is the assertion that insurance companies will cease writing auto theft insurance if the confidential location is revealed. Neither the interests of the insurance companies nor the convenience of law enforcement agencies can justify depriving this accused of his constitutional right to cross-examine the prosecution's witnesses on so important a link in the case against him.

"The right to cross-examine is basic in our judicial system, *Alford* v. *United States,* 282 U.S. 687 [51 S.Ct. 218, 75 L.Ed. 624]; *People* v. *Becker,* 210 N.Y. 274, 304-305 [104 N.E. 396, 407]; *People* v. *Cole,* 43 N.Y. 508, 512-513, and has been from earliest times, *Friedel* v. *Board of Regents of University of New York,* 296 N.Y. 347, 352 [73 N.E.2d 545, 548]. Although in the last-cited case we held that 'once the right has been accorded, the extent of cross-examination rests largely in the discretion of the tribunal, whose exercise thereof is not reviewable unless abused', such a denial or limitation of cross-examination has been upheld only where it has related to collateral matters, or where the right itself has been abused, [citations]. Surely a Trial Judge cannot deprive a defendant of his constitutional right to inquire where, as here, the matter is directly relevant to the principal issues of the case against him, *People* v. *Becker, supra*; *Alford* v. *United States, supra*; *People* v. *Cole, supra.*

"Even if the information in question were in any sense privileged, the People abandoned any such privilege by adducing on direct examination the discrepancy between the two motor numbers, *United States* v. *Andolschek,* 2 Cir., 142 F.2d 503, 506; *United States* v. *Beekman,* 2 Cir., 155 F.2d 580, 584; *United States* v. *Keown,* D.C., 19 F.Supp. 639; *United States* v. *Coplon,* 2 Cir., 185 F.2d 629, 638, certiorari denied 342 U.S. 920 [72 S.Ct. 362, 96 L.Ed. 688]; see *People* v. *Schainuck,* 286 N.Y. 161 [36 N.E.2d 94]; *Gordon* v. *United States,* 344 U.S. 414 [73 S.Ct. 369, 97 L.Ed. 447]. One may not 'fill a gap in his own evidence by recourse to what he suppresses', *United States* v. *Coplon, supra,* 185 F.2d

at page 638; see also, *United States* v. *Reynolds,* 345 U.S. 1, 12 [73 S.Ct. 528, 97 L.Ed. 727].

"Of course the insurance companies and the police are free to use such confidential motor numbers in conducting their auto theft investigations. But in a court of justice they either must employ some other method of identifying the stolen car—as indeed they could have confined themselves to in this case—or, if the confidential number is used as evidence against the defendant, they must permit their witnesses to be cross-examined with respect thereto, including its confidential location. A prosecution witness may not have immunity from defendant's fundamental right of cross-examination upon so vital a matter as identification on the ground that his evidence is an impenetrable secret." (To the same effect, *Riley* v. *State,* 40 Okla.Crim. 380 [269 P. 390, 391.)

Dissenting in *United States* v. *Nugent,* 346 U.S. 1 [73 S.Ct. 991, 97 L.Ed. 1417], Mr. Justice Douglas wrote (97 L.Ed. 1426):

"The use of statements by informers who need not confront the person under investigation or accusation has such an infamous history that it should be rooted out from our procedure. A hearing at which these faceless people are allowed to present their whispered rumors and yet escape the test and torture of cross-examination is not a hearing in the Anglo-American sense. We should be done with the practice—whether the life of a man is at stake, or his reputation, or any matter touching upon his status or his rights. If FBI reports are disclosed in administrative or judicial proceedings, it may be that valuable underground sources will dry up. But that is not the choice. If the aim is to protect the underground of informers, the FBI report need not be used. If it is used, then fairness requires that the names of the accusers be disclosed. Without the identity of the informer the person investigated or accused stands helpless. The prejudices, the credibility, the passions, the perjury of the informer are never known. If they were exposed, the whole charge might wither under the cross-examination."

I can only speculate on why the informers were not called by the prosecution. If they had the information the officers said they received from them, they were material witnesses against defendant. It seems not an unlikely assumption that blemishes and defects of character would have led a jury to distrust their testimony. It appears from the evidence

they were probably narcotic users. Apparently they were close enough to the underworld to serve as bait.

In the present case the following procedure was pursued: "THE COURT: . . . Mr. Smith [one of the police officers], I will instruct you that the law gives you the privilege of refusing to divulge the name of the informant if you so desire if the information was given to you in confidence, and the public interest would suffer by revealing the name of the informant. I am not informed as to whether or not that is the fact. THE WITNESS: It is a fact. I do not wish to divulge the confidential information. THE COURT: Was it given to you in confidence by the informer? THE WITNESS: Yes. THE COURT: Could you tell me whether or not the public interest would suffer if the name of the informer were given? THE WITNESS: Yes, it would. THE COURT: I have used the word 'informant' in the singular. I believe you said there were four. THE WITNESS: Yes, there were four. THE COURT: Does that apply to each of the four? THE WITNESS: Yes, it does. THE COURT: Then I will sustain the ruling that I made on the objection to the last question." The witness also testified the informants were reliable. The same procedure was pursued with Officer DeLeon. This procedure was manifestly wrong. The authorities are legion that it is for the court, not the witness, to determine whether the communications were made in official confidence and whether the public interest would suffer by disclosure.[2] There was no evidence as to how the public interest would suffer—only the opinions of the officers. Testimony of a police officer that such a person is reliable is a pure conclusion of the officer. It is strange indeed that in practically all the cases reaching the reviewing courts in recent months involving the lawfulness of the arrest or of a search, the basis of the arrest or search was either wholly or in large part information received from anonymous informers. As counsel for defendant put it below, "since the exclusionary rule came

---

[2]Wigmore says: "The truth cannot be escaped that a Court which abdicates its inherent function of determining the facts upon which the admissibility of evidence depends will furnish to bureaucratic officials too ample opportunities for abusing the privilege. The lawful limits of the privilege are extensible beyond any control, if its applicability is left to the determination of the very official whose interest it may be to shield a wrongdoing under the privilege. Both principle and policy demand that the determination of the privilege shall be for the Court; and this has been insisted upon by the highest judicial personages both in England and the United States." (8 Wigmore on Evidence, 3d ed., 799, § 2379.)

into effect there has been almost an identical pattern of testimony by police officers as to their reasons for making the arrest.'' If it is the law that an arrest is lawful if made solely on information received from informers and that the names of the informers need not be disclosed, *People* v. *Cahan,* 44 Cal.2d 434 [282 P.2d 905] might just as well not have been written.

Defendant contends that by calling the officers and having them testify to information they claimed they had received from the informers, the prosecution waived any right to fore-close the defendant from ascertaining the names of the informers on cross-examination. The prevailing opinion does not discuss the point, nor was it considered in the cases cited in that opinion. The point is good. Where an officer testi-fies he obtained information from an informer and what that information was, he thereby waives any right to refuse to dis-close the name of the informer. On disclosure the defendant has the right to subpoena the person named and ascertain his version of the facts.

''The privilege exists, on grounds of public policy which are well known, for the purpose of keeping from the public those matters which come within the law of confidential com-munications. It would seem that one who might otherwise object on the ground of privilege is estopped to do so when he has introduced evidence which discloses the very intelli-gence which he claims is privileged. There appears to us to be a close analogy between this point and another which has frequently been decided. Where one introduces evidence of certain facts he waives the right to object to the offer of evidence of the same facts by his opponent (*South St. Louis Ry. Co.* v. *Plate,* 92 Mo. 614 [5 S.W. 199]; *Hobbs* v. *Board,* 116 Ind. 376 [19 N.E. 186]; *Chicago, K. & N. Ry. Co.* v. *Wiebe,* 25 Neb. 542 [41 N.W. 297]; *Carstens* v. *Stetson & Post Co.,* 14 Wash. 643 [45 P. 313]; *Warren Live Stock Co.* v. *Farr,* 142 F. 116; *Starcher* v. *South Penn. Co.,* 81 W.Va. 587 [95 S.E. 28]; *Adams* v. *Ristine,* 138 Va. 273 [31 A.L.R. 1413, 122 S.E. 126]; *Peter & Burghard Co.* v. *Marion Bank* [Ind.App.], 149 N.E. 79; *Jameson* v. *Tully,* 178 Cal. 380 [173 P. 577]).'' (*Estate of Visaxis,* 95 Cal.App. 617, 624 [273 P. 165]; *Moreno* v. *New Guadalupe Mining Co.,* 35 Cal.App. 744, 753-756 [170 P. 1088].)

The Supreme Court of the United States in *On Lee* v. *United States,* 343 U.S. 747 [72 S.Ct. 967, 96 L.Ed. 1270], has this to say (96 L.Ed. 1277):

"The use of informers, accessories, accomplices, false friends, or any of the other betrayals which are 'dirty business' may raise serious questions of credibility. To the extent that they do, a defendant is entitled to broad latitude to probe credibility by cross-examination and to have the issues submitted to the jury with careful instructions."

The Supreme Court of Utah in *State* v. *Hoben*, 36 Utah 186 [102 P. 1000], said (102 P. 1005):

"Though it should be conceded for the purpose of this decision that the matters inquired about were privileged under this subdivision [a statute similar to section 1881(5) of the Code of Civil Procedure], still the ruling was wrong, because the government itself invited the testimony and sought the disclosure. It opened the door and entered upon an inquiry concerning the very matters claimed to be privileged. . . . There is no doubt that there may be communications made to a public prosecutor which are privileged; and though it should be conceded that these communications were such, yet where the state, as here, invites a disclosure, and itself inquires about the matters claimed to be privileged, or permits, or acquiesces in, such inquiry, without objection, it may not have a disclosure of a part of the truth, and then be heard to assert that 'public interests' will suffer if the whole truth is disclosed. In other words, the state may not permit, or acquiesce in, the disclosure so long as the matters disclosed make against the defendant, and then put a stop to it when they are to the defendant's advantage."

*State* v. *Yee Guck*, 99 Ore. 231 [195 P. 363], says (195 P. 365):

"Among the contentions of the state on this point is one based on the last clause in section 733, Ore. L., reading thus:

" 'A public officer shall not be examined as to communications made to him in official confidence when the public interest would suffer by the disclosure.'

"Assuming, without deciding, that the conversation between the witnesses and the district attorney was privileged, it is a privilege of the officer—in this case the one in control of the prosecution. It is within his prerogative to waive the exemption embodied in the clause quoted. In offering the whole document for the jury's consideration he waived the exemption, and, moreover, was clearly of the opinion that the public interest would not suffer by submitting the transcription to the jury. This section therefore must be laid out of the case."

*United States* v. *Schneiderman,* 106 F.Supp. 731, states (p. 738):

"Accordingly, since the prosecution at bar, conducted under the supervision of the Attorney General [28 U.S.C. § 507(b)], has adduced evidence 'touching the subject matter communicated' in the reports, it must be held that any privilege of withholding from inspection and use by the defense of sealed exhibits 729, 730 and 731 under authority of 'Department of Justice Order No. 3229' has been waived. See *Touhy* v. *Ragen, supra,* 340, U.S. at pages 468, 469, 472-473 [71 S.Ct. 416, 95 L.Ed. 417]."[3] (*Cf. City & County of San Francisco* v. *Superior Court,* 37 Cal.2d 227, 233 [231 P.2d 26, 25 A.L.R.2d 1418]; *People* v. *King,* 122 Cal.App. 50, 56-57 [10 P.2d 89]; *In re Strand,* 123 Cal.App. 170, 172 [11 P.2d 89].)

My position in this respect is that the prosecution, having called the officers to whom the communications are said to have been made and required them to state what the communications were, thereby waived the privilege and subjected the officers to cross-examination on the subject-matter of the communications, including the names of the persons by whom they were made. The prosecution could not require the

---

[3] Wigmore refers to an English case and quotes therefrom as follows: "1863, *R.* v. *Richardson,* 3 F. & F. 693; murder by poison; a policeman, having testified to finding poison on a search of defendant's premises in consequence of information received, refused under police regulations to give the names of his informants. COCKBURN, C. J., 'ordered him immediately to answer the question, observing that in this case it was most material to the ends of justice that it should be stated'; and it then appeared that the informants were 'two girls who were not called as witnesses for the prosecution.' The Chief Justice afterwards commenting strongly on the failure to produce them, the *Reporters* add: 'Though in this particular case it was not so, yet it might be in similar cases that the information was given by or derived from the really guilty party with a view to divert suspicion from himself and fix it on an innocent person; or again, it might be (and in this case it was so) that the information was derived from the accused herself and was accompanied by a statement showing her innocence. . . . The effect of applying the supposed rule in such cases, it is manifest, would be to enable prosecutors or policemen to produce such portions of evidence as they might please, and to withhold the witnesses the whole of whose evidence might demonstrate the innocence of the accused. It is extraordinary that it should ever have been supposed that (in ordinary cases at all events) there ever was such a rule; and the latest writer on the subject, Mr. Best, entirely ignores it except in political cases. And it may deserve consideration whether ever in such cases it applies where the question is asked, not merely with a view to elicit the name for purposes of observation or credit, etc., but when (as in the present instance) the party who gave the information must have been in a position to disclose something further as to the facts of the case.' " (8 Wigmore on Evidence, 3d ed., 756.)

officers to disclose as much of the matter as was helpful to it, and then shut the door as to any further inquiry by the defendant relating to the communications. Having required a partial disclosure, or rather one substantially covering the entire matter, it waived its privilege, and the defendant became entitled to a full disclosure.

The communications, to the extent they were given, were important evidence for the prosecution; in fact they were the only evidence bearing on the legality of the arrest, i.e., whether the officers had probable cause for making the arrest —a vital issue in the case. The evidence which the officers gave may or may not have been truthful; they may or may not have received the communications; and if they received them, they may not have been obtained from persons worthy of credit; if they were not received from persons worthy of credit, it could have been found that the officers acted without probable cause in making the arrest; and if the names of the characters said to have made the communications had been given and one or more of them had been called as a witness and denied making the communication, it might reasonably have been found the communications were not made, that probable cause for the arrest did not exist. In the only California case which has come to my attention in which the alleged informer was identified by the officer, he (the alleged informer) was called by the defendant and testified he had not given the officer any information. (*People* v. *Lunbeck,* 146 Cal.App.2d 539 [303 P.2d 1082].) Certainly a defendant in a criminal action should not be precluded from rebutting the testimony of the officer and thus let the court determine the fact. As Wigmore, referring to the privilege, puts it, "It is not to be both a sword and a shield." (8 Wigmore on Evidence, 3d ed., 830, § 2388.)

The privilege of a defendant in a criminal action to confrontation by the witnesses against him in the presence of the court is protected by the due process clause of the federal and state Constitutions. (*Snyder* v. *Massachusetts,* 291 U.S. 97, 106 [54 S.Ct. 330, 78 L.Ed. 674, 678, 90 A.L.R. 575].) The denial of the right of cross-examination is a denial of due process. (*Olive Proration etc. Committee* v. *Agricultural etc. Committee,* 17 Cal.2d 204, 210 [109 P.2d 918]; *People* v. *Valdez,* 82 Cal.App.2d 744, 749 [187 P.2d 74]; *Langendorf etc. Bakeries* v. *Industrial Acc. Com.,* 87 Cal.App.2d 103, 104 [195 P.2d 887]; *Columbia etc. Steel Div.* v. *Industrial Acc. Com.,* 115 Cal.App.2d 862, 865 [253 P.2d 45]; *In re Shackel-*

*ford,* 116 Cal.App.2d 864, 867 [254 P.2d 610] ; *Argonaut Ins. Exchange* v. *Industrial Acc. Com.,* 120 Cal.App.2d 145, 146-154 [260 P.2d 817].) "It is a deprivation of constitutional due process to receive evidence without the opportunity to rebut and cross-examine." (*Columbia etc. Steel Div.* v. *Industrial Acc. Com.,* 115 Cal.App.2d 862, 865 [253 P.2d 45].) This court in *In re Shackelford,* 116 Cal.App.2d 864 [254 P.2d 610], said (p. 867) :

"The petitioner (defendant) was entitled to be confronted by the witnesses, to have an opportunity to cross-examine them, and to examine the documentary evidence. It does not appear that he was accorded those rights. . . . Receiving such additional evidence without according the petitioner such above-mentioned rights of confrontation and examination was a denial of a fair hearing, and amounted to a denial of due process of law."

Concurring in *Peters* v. *Hobby,* 349 U.S. 331 [99 L.Ed. 1129, 75 S.Ct. 790], Mr. Justice Douglas stated (99 L.Ed. 1143) :

"Dr. Peters was condemned by faceless informers, some of whom were not known even to the Board that condemned him. Some of these informers were not even under oath. None of them had to submit to cross-examination. None had to face Dr. Peters. So far as we or the Board know, they may be psychopaths or venal people, like Titus Oates, who revel in being informers. They may bear old grudges. Under cross-examination their stories might disappear like bubbles. Their whispered confidences might turn out to be yarns conceived by twisted minds or by people who, though sincere, have poor faculties of observation and memory.

"Confrontation and cross-examination under oath are essential, if the American ideal of due process is to remain a vital force in our public life. We deal here with the reputation of men and their right to work—things more precious than property itself. We have here a system where government with all its power and authority condemns a man to a suspect class and the outer darkness, without the rudiments of a fair trial. The practice of using faceless informers has apparently spread through a vast domain. It is used not only to get rid of employees in the Government, but also employees who work for private firms having contracts with the Government. It has touched countless hundreds of men and women and ruined many. It is an un-American practice which we should condemn. It deprives men of 'liberty' within the meaning of

the Fifth Amendment, for one of man's most precious liberties is his right to work. When a man is deprived of that 'liberty' without a fair trial, he is denied due process. . . .

"Those who see the force of this position counter by saying that the Government's sources of information must be protected, if the campaign against subversives is to be successful. The answer is plain. If the sources of information need protection, they should be kept secret. But once they are used to destroy a man's reputation and deprive him of his 'liberty,' they must be put to the test of due process of law. The use of faceless informers is wholly at war with that concept. When we relax our standards to accommodate the faceless informer, we violate our basic constitutional guarantees and ape the tactics of those whom we despise."

Defendant was deprived of due process of law when he was denied the right to ascertain the names of the informers.

I would reverse.

Appellant's petition for a hearing by the Supreme Court was denied May 22, 1957. Carter, J., was of the opinion that the petition should be granted.